# 1162

## GEORGE K. HEEBNER, JR., AND RUTH S. HEEBNER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64882.  Filed September 10, 1959.

*George F. Shinehouse, Jr., Esq.*, for the petitioners.
*Max J. Hamburger, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in income tax of $114,372.68 for 1953.

The principal question for decision is whether or not the Commissioner properly treated the profit realized on the disposition of certain property as ordinary income rather than capital gain.  If this question is resolved against petitioners, subsidiary issues as to an expense deduction and a determined "dividend realization" will become moot.

### FINDINGS OF FACT.

Some of the facts have been stipulated, are so found, and the stipulation is incorporated herein.

Petitioners, George K. Heebner, Jr., and Ruth S. Heebner, husband and wife, residing in Philadelphia, Pennsylvania, filed their joint individual income tax return on a cash basis for the calendar year 1953 with the director of internal revenue, Philadelphia, Pennsylvania.

During the year 1953 George was employed as president of George K. Heebner, Incorporated, a corporation organized under the Pennsylvania laws on March 29, 1934.  This corporation is engaged in the business of designing and constructing industrial and commercial buildings.  George owned 89.54 per cent of the outstanding stock of the corporation and his two brothers owned the rest.

During the years 1951 through 1953, George individually engaged in the building and construction business.  He was educated as an architect and had entered the building business some years before with his father who had previously been in that business.

George was one of an early group of builders who did building and contracting under that general term and sometimes engaged also in "package" building. This latter term is applied to a builder who not only constructs a building pursuant to the specifications of a customer but who also undertakes other necessary facets of the building project such as design, finding the proper location, arranging financing, and finally delivering the completed project to the prospective purchaser. All projects undertaken by George were not package projects but those that were, were undertaken with the purpose of getting "his foot in the door as a builder."

Despite his employment as president of George K. Heebner, Inc., George, during the year 1953 and years prior thereto, i.e., since about 1930, was individually engaged in the building and construction business and also doing package building.

During the years 1949 to 1953, inclusive, George individually, as a builder and contractor, derived taxable income from building operations as set forth in the following schedule:

| Taxable year | Total receipts from business as contractor and builder |
|---|---|
| 1949 | $109,067.61 |
| 1950 | 366,265.37 |
| 1951 | 380,251.11 |
| 1952 | [1] 135,040.62 |
| 1953 | [1] 2,145.00 |

[1] These figures do not include any portion of the $650,000 received by George in connection with the Sharon Hill construction project under review in this case.

The portion of his total business receipts for the taxable years 1949 to 1953, inclusive, as above set forth, which was paid out by him in connection with work subcontracted and as selling expense was as follows:

| Taxable year | Subcontract payments | Selling expense | Taxable year | Subcontract payments | Selling expense |
|---|---|---|---|---|---|
| 1949 | $101,366.94 | $294.40 | 1952 | $13,530.08 | $170.00 |
| 1950 | 242,323.92 | 315.00 | 1953 | 250,668.90 | 149.79 |
| 1951 | 160,796.59 | 422.31 | | | |

The following schedule sets forth George's building and construction projects in his individual capacity, for the years 1949 to 1954, inclusive, in which only those individual jobs exceeding $20,000 in cost were included:

| Taxable year | Job name | Address | Total billings |
|---|---|---|---|
| 1949 | No data submitted | | |
| 1950 | Doylestown Agricultural Co | Doylestown, Pa | $82, 200. 00 |
| | Plachter Cadillac | Frankford & Torresdale | 32, 100. 00 |
| | Crisconi (Phila. Motor Car Co.) | 1155 S. Broad Street | 31, 300. 00 |
| | Schutte Koerting Co. (factory) | Cornwell Heights, Pa. (Job #1) | 127, 200. 00 |
| | Del Mont Motors | Bryn Mawr, Pa | 68, 500. 00 |
| | Total | | 341, 300. 00 |
| | Total receipts per 1950 return | | 366, 265. 37 |
| 1951 | Fort Washington Park | Harrisburg, Pa | 43, 800. 00 |
| | Forms, Inc | Jenkintown, Pa | 21, 200. 00 |
| | Schutte Koerting Co. (Office building) | Cornwell Heights, Pa. (Job #2) | 217, 400. 00 |
| | Fessenden Hall | Third & Norris Sts | 45, 200. 00 |
| | Total | | 327, 600. 00 |
| | Total receipts per 1951 return | | 380, 251. 11 |
| 1952 | Bechtold | Levick & Algan Sts | 135, 400. 00 |
| | Total receipts per 1952 return | | 135, 040. 62 |
| 1953 | No data submitted | | |
| 1954 | Spruance | Richmond & Tioga | 166, 600. 00 |
| | Honor Bilt | Sepviva & Venango | 214, 100. 00 |
| | Total | | 380, 700. 00 |

Sometime in May or June 1951, John McDonald and Allan G. Weaver (now deceased), Philadelphia real estate brokers, informed George that Nash-Kelvinator Sales Corporation, a Michigan corporation, was interested in locating offices and a warehouse in the Philadelphia suburban area. Nash-Kelvinator Sales Corporation is a wholly owned subsidiary of Nash-Kelvinator Corporation, a Maryland corporation, engaged in the business of selling appliances, parts, and automotive products.

Upon receipt of this information George made contact with the Baltimore and Ohio Railroad for the purpose of acquiring a building site adjacent to the Baltimore and Ohio Railroad right-of-way in the Sharon Hill, Pennsylvania, section upon which to construct the warehouse in question for Nash-Kelvinator. The title to the Sharon Hill property under consideration, which George subsequently acquired, was held of record in the name of the Schuylkill Improvement Land Company of Philadelphia, a wholly owned subsidiary of the Baltimore and Ohio Railroad Company. George also contacted Nash-Kelvinator to ascertain the desired specifications of the warehouse in question. For the purpose of arranging the financing for building the warehouse he also contacted the Frankford Trust Company which is a banking corporation authorized to make construction loans. This contact was made at least a month before August 30, 1951. As early as July 13, 1951, George had already contacted Prudential Insurance Co. representatives and whatever discussions, if any, they may previously have had about Prudential's "financing" the deal had been abandoned, and they were negotiating for a sale of the completed premises to Prudential for George was then submitting the Nash-Kelvinator lease for Pruden-

tial consideration. It was apparent that under Federal Regulation X of the Board of Governors of the Federal Reserve System, Prudential would not "finance" the construction, and negotiations began with a view to have Prudential take over the Sharon Hill project by purchase upon its completion.

George planned from the very beginning to execute the transaction by taking title to the Sharon Hill site in his individual name, and to have the construction contract performed by "his company, George K. Heebner, Incorporated." Then the corporation, instead of George, would apply for the loan in the corporation's name. In this way he expected that his plan would "comply with the requirements of Regulation X, and may also permit us to utilize the long term capital gain provisions for George." However, in considering the loan application of the corporation, Frankford Trust Company was equally interested in George's financial soundness, and his financial statements as well as those of the corporation were submitted to Frankford Trust Company.

As a result of these negotiations he was able to obtain satisfactory commitments from the parties interested in participating in the Sharon Hill project. In July 1951 George obtained an option on the site and by agreement dated September 5, 1951, the Schuylkill Improvement Land Co. agreed to convey the Sharon Hill site to him upon certain specified conditions for the sum of $45,000. On September 4, 1951, Frankford Trust Company agreed to make the construction loan, in the amount of $600,000, to George K. Heebner, Inc., the proposed building contractor, with Girard Trust Company, Philadelphia, Pennsylvania, as participating lender. In July 1951 George obtained a preliminary lease from Nash-Kelvinator and preliminary building specifications were approved. On August 14, 1951, Nash-Kelvinator committed itself to lease the completed warehouse, subsequently confirmed by Nash-Kelvinator by a letter agreement of September 4, 1951. During August 1951, Prudential committed itself to purchase the land and building, upon the completion thereof and by letter of September 11, 1951, gave written confirmation thereof. On September 28, 1951, George as an individual entered into an agreement with George K. Heebner, Inc., by George K. Heebner, Jr. (petitioner), president, and owner of 89.54 per cent of its stock, to construct the building, commencing within 30 days after September 28, 1951, the building in no event to cost more than $550,000, including the profit of George K. Heebner, Inc. Thereafter the corporation proceeded to build the building in question.

The commitment of each of the participants in the Sharon Hill project with whom George negotiated was dependent upon and conditioned upon a commitment of one or more of the other participants.

Among these interdependent commitments were the following: Schuylkill Improvement Land Co. agreed to sell the Sharon Hill site to George by special warranty deed only on condition that he would construct the warehouse for Nash-Kelvinator within 2 years, and failing to do this Schuylkill expressly reserved the right to repurchase the site for the $45,000 to be paid by George for the site. Frankford Trust Company agreed to make the construction loan to George K. Heebner, Inc., only upon condition that Nash-Kelvinator would agree to lease and Prudential Insurance Co. would agree to purchase the site and building upon completion. Further, Prudential Insurance Co. agreed to purchase the finished project only if Nash-Kelvinator would agree to lease, and also conditioned upon the right of final approval by Prudential of the working details, plans, and specifications of the building and the terms of the deed of conveyance.

In each significant detail of the supervision and construction of the Sharon Hill project from its inception in May or June 1951 until final transfer February 15, 1953, George reported to and obtained the approval of the Prudential Insurance Co., as the ultimate party for whom the project was being constructed. The form of agreement to lease between George and Nash-Kelvinator was submitted to Prudential. George submitted the estimate of the cost of the building to Prudential together with the specifications of the building for approval. The settlement sheet covering the Sharon Hill site, with the objections raised to the title by the title company, were submitted to Prudential for its consideration. Negotiations among George, his attorney, and Prudential representatives were conducted continuously throughout the construction of the Sharon Hill project.

After George had obtained commitments from the respective participants, formal agreements were executed by the several interested parties. On September 24, 1951, Schuylkill Improvement Land Co. conveyed the Sharon Hill site to George by special warranty deed, formally reserving the right to repurchase if no warehouse were built within 2 years.

The contract for construction of the building dated September 28, 1951, between George K. Heebner, Jr., individual, and George K. Heebner, as president of George K. Heebner, Inc., provided that the corporation would be paid for the construction job within 30 days "after final completion of the work," and the corporation agreed to furnish a performance bond.

On November 13, 1951, Nash-Kelvinator entered into a formal agreement to lease the warehouse under construction at Sharon Hill. On July 31, 1952, Nash-Kelvinator and George K. Heebner, Jr. entered into an agreement modifying the lease agreement of November 13, 1951, with particular reference to the meaning of the terms "substantial completion" and "final completion" of the warehouse.

It was agreed that Nash-Kelvinator would take possession on August 1, 1952, under a definition of "substantial completion" of the building. The agreement further provided as follows:

2. The initial term of twenty-five (25) years recited in said lease shall commence February 15, 1953 on or before which date GEORGE K. HEEBNER, JR. will finally complete said building in full compliance with the Plans and Specifications mentioned in said Lease of November 13, 1951.

On December 12, 1951, the Fidelity and Deposit Company of Maryland, as surety, and George K. Heebner, Inc., as principal, executed a surety bond covering construction of the Sharon Hill warehouse.

Since final plans for the building had not been approved before January 3, 1952, Prudential agreed to extend its purchase-commitment period for a period of 60 days after January 3, 1952.

The first draw of the corporation against its loan from Frankford Trust Company took place December 28, 1951, and the final draw in connection therewith was dated October 10, 1952.

The Commonwealth of Pennsylvania enacted legislation, effective January 31, 1952, taxing all real estate transfers at a rate of 1 per cent, which would produce a tax of $6,500 on the transfer of the Sharon Hill project from George K. Heebner, Jr., to Prudential upon the completion thereof as contemplated. Recognizing this fact, and in order to mitigate the tax, the petitioner, by his attorney, on January 8, 1952, proposed to Prudential that there be "a conveyance immediately by George K. Heebner, Jr., of the ground, with the building in the process of erection." Negotiations followed between George and Prudential representatives in which George conveyed to Prudential the view that George considered that, in reality, he was "building the property for us, which is to be occupied by Nash and that he is, in fact, only the temporary owner." In consequence of these negotiations the $6,500 transfer tax was paid, one-half ($3,250) by George and one-half ($3,250) by Prudential. The substance of this agreement was incorporated in the formal agreement between George and Prudential, dated February 18, 1952.

The formal agreement dated February 18, 1952, provided that Prudential would purchase from George the "piece of ground with buildings thereon to be erected" at Sharon Hill, Pennsylvania, which property is described by metes and bounds, for the sum of $650,000. No change was to be made in building plans dated October 19, 1951, without approval of Prudential. Settlement was to be made on the first day of the month following "final completion of said building in accordance with the aforesaid Plans and Specifications" and acceptance by Nash-Kelvinator.

On August 1, 1952, Nash-Kelvinator took possession of the Sharon Hill warehouse pursuant to its lease with petitioner and thereafter and until February 15, 1953, paid rent to George. The building su-

perintendent of George K. Heebner, Inc., remained on the premises until about August 15, 1952, and performed such odd jobs as were required.

On January 19, 1953, George, by his attorney, wrote to Prudential advising that on or about February 15, 1953, he would make conveyance to Prudential provided that Prudential had "made an inspection and formally accepted the building as complete." The letter asked that Prudential advise if it had "made an inspection and formally accepted the building as complete." Under date of February 11, 1953, Prudential issued its "Appraiser's Final Certificate" stating that the building had been "properly completed in accordance with plans and specifications originally examined."

By settlement of February 16, 1953, which was held at the Frankford Trust Company, Philadelphia, George conveyed the Sharon Hill property to Prudential Insurance Company of America, for the sum of $650,000. The selling price of ground and building was $650,730.06, less settlement expenses of $10,741.40, or a net figure of $639,988.66, payable to George.

The cost basis to George of the ground, lease, and building is as follows:

| Item | Cost basis | Percentage relation of cost of each item to total cost of all items |
|---|---|---|
| Ground | $45,899.71 | 10.123 |
| Lease | 21,000.00 | 04.631 |
| Building | 386,487.34 | 85.246 |
| Total cost | 453,387.05 | 100.000 |

George K. Heebner, Inc., reported in its 1953 income tax return that it had realized a gross profit of $18,168.24 as a result of the construction of the Sharon Hill building. The Commissioner determined that under the agreement of petitioner with George K. Heebner, Inc., dated September 28, 1951, the corporation had realized a profit in the amount of $28,668.24, and allocated an additional profit to the corporation of $10,500. This was agreed to by the corporation. Inasmuch as this $10,500 factor was part of the proceeds paid to George pursuant to the settlement, it was treated by the Commissioner as constructive dividend income to George individually, and was allowed to him as an additional cost, payable to the corporation, for the construction of the building.

George paid the real estate brokers, John McDonald and Allan G. Weaver, a commission of $21,000 for their services. On his 1953 income tax return George deducted $20,650 ($20,510 plus $140) as an ordinary expense deduction against rental income received by him

from Nash-Kelvinator. The Commissioner disallowed the deduction and determined that the $20,650 represented an additional cost of the Sharon Hill property.

The Sharon Hill project involved all the major elements of a package deal, to wit, site selection, planning and design, financing, and construction, and was essentially a package transaction in keeping with George's trade or business.

As of the commencement of the Sharon Hill project, to wit, May or June 1951, and through the taxable year 1952, George was the owner of the following two properties: A building at 1231 Vine Street, Philadelphia, which had been his place of business and that of his father for many years and which George used as his personal office, renting a portion of it to his corporation, the George K. Heebner, Inc.; and a house at 249 Gorgas Lane, Philadelphia, which formerly had been his residence and thereafter was rented out. He owned no other property as late as December 31, 1952, excluding consideration of the Sharon Hill project.

### Ultimate Findings.

The work performed by George in connection with the development and final disposition of the Sharon Hill project, to wit, site selection, assistance in design and lease negotiation, financing arrangements, and building construction, was in keeping with his regular business operations and the resulting profit in the amount of $193,544.49 was derived from property held by him primarily for sale to customers in the ordinary course of his trade or business.

The development and final disposition of the Sharon Hill site and warehouse did not represent a capital asset transaction within the meaning of section 117(a)(1)(A), I.R.C. 1939, and the resulting profit realized by George in taxable year 1953, in the amount of $193,544.49, was taxable to him at ordinary income rates.

OPINION.

There is no substantial quarrel between the parties as to the underlying facts. They differ only as to the ultimate conclusions to be drawn from them. Petitioners contend that the transaction in question was an "isolated nonrecurring sale" and that George's activities in connection therewith do not constitute "engaging in business."

On the record we cannot so hold. To us it is clear that the transaction was part of the petitioner's continuing business. That it might have been a unique transaction, in that George had not over the years engaged in a large number of transactions involving exactly the same factual situations, does not control. He testified that this deal was different from his usual deals of this kind, because he "wanted to own

this one." But he did not own it. His ultimate design was to build this particular warehouse for sale and that is what actually happened. All of the so-called financing was bottomed on a planned sale of the building to Prudential. This sale was arranged practically from the beginning of the negotiations for construction of the building. If it had not been so arranged and the sale commitment had not been obtained from Prudential, there is nothing in the record to show the project would ever have been undertaken.

With reference to the particular transaction, George's testimony was vague. About the proposed financing he said he was talking to banks and insurance companies "all the time, and I've got a million leads." Further, though he argues this was not a "package deal," he acknowledged he had been in the business of "package building" since he had gone in business with his father, though this was modified by saying that only about 1 in 50 projects was a package deal. He testified "in a limited way [since he went in business with his father] I was doing package building, but I didn't so advertise it." However, the fact that the real estate brokers who first ran across the Nash-Kelvinator need for a warehouse came to George with the proposition, is indicative that they knew he was in the business of doing just what was done here. The protracted time he spent on the complicated transactions necessary to the deal, in procuring the land and arranging for his corporation to do the building, in planning and concluding a satisfactory lease on Prudential's terms, and in procuring the purchase commitment from Prudential, are also signposts pointing to an ordinary business transaction from his standpoint. In many ways, the income involved herein was income earned from personal services of the taxpayer rather than from a capital transaction and should be taxed as such. We find nothing in the record which would justify a finding that George ever intended this project solely as an "investment" transaction and not as one where the eventual disposition was not in his usual course of business. True, he did collect some rentals from Nash-Kelvinator, but this was only an interim proposition—the ultimate sale to Prudential was a foregone fact—it had been arranged by and on behalf of George and agreed upon from the beginning. As thus arranged, the transaction was carried out as agreed. See *Williamson* v. *Commissioner*, (C.A. 4) 201 F. 2d 564, affirming 18 T.C. 653, and *Morris W. Zack*, 25 T.C. 676, affd. (C.A. 6) 245 F. 2d 235.

We think that George was in the business of doing just what was done here and we approve the Commissioner's determination that the development and final disposition of the Sharon Hill project, by George, did not represent a capital asset transaction within the meaning of section 117(a) (1) (A).

This holding makes unnecessary any further consideration of the other issues involving broker's commissions and the matter of a constructive dividend of $10,500. These were agreed by the parties to depend upon the solution of the primary question as to whether or not the profit on the Sharon Hill transaction was capital gain or ordinary income.

*Decision will be entered under Rule 50.*