STEPHEN W. BAUMGART AND MARGARET G. BAUMGART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baumgart v. Commissioner
Docket No. 14440-80.
United States Tax Court
T.C. Memo 1983-738; 1983 Tax Ct. Memo LEXIS 48; 47 T.C.M. (CCH) 592; T.C.M. (RIA) 83738; December 12, 1983. *48 Held:
(1) Receipt of income from sale of railroad cars is ordinary income. (2) Petitioner has met his burden of proof with respect to $20,000 deducted as commission expense in 1976. *49 Douglas E. McKinley, for the petitioners. Warren P. Simonsen, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Petitioners Stephen W. Baumgart and Margaret G. Baumgart are husband and wife and resided in Reston, Virginia, when the petition in this case was filed. Petitioner Stephen W. Baumgart is hereafter referred to as "petitioner." Respondent determined deficiencies in petitioners' Federal income tax of $114,712 and $18,380 for the years 1975 and 1976, respectively. After concessions by both parties the issues remaining are (1) whether the petitioner's sale of railroad cars in 1975 is subject to ordinary income or long-term capital gain treatment, and (2) whether petitioners have met their burden of proof with respect to $20,000 deducted as commission expense in 1976. For convenience, we will combine our Findings of Fact and Opinion. *50 Capital Gain vs. Ordinary Income
Prior to the years at issue, petitioner was in the business of providing marketing and consulting services to American manufacturers desiring to sell their products to foreign purchasers. The business was in the form of two sole proprietorships called B Associates and Gateway International Company (Gateway International). He was paid for his efforts on a commission basis, based upon the amount of the sale. Although his businesses were sole proprietorships, petitioner did some of his business with the assistance of another individual named Kenneth R. McGuire (McGuire). Through his business contacts, petitioner discovered that there might be a good business opportunity in the leasing of used railroad cars. He discovered that Greenville Steel Car Company (Greenville) had such cars for sale. On September 17, 1974, petitioner and McGuire formed GILCO, a general partnership, [1] for the purpose of acquiring used railroad cars to be owned, leased, and operated by GILCO. The cars were to be acquired from Greenville pursuant to the exercise of a previously negotiated (but not yet formalized) option. *51 The option agreement was formalized on September 24, 1974. It granted GILCO an option to purchase from Greenville 549 Twin Hopper cars for $5,500 per car, [2] or a total of $3,019,500. If GILCO accepted the option, Greenville required GILCO to have an irrevocable letter of credit issued to Greenville to secure payment of $15,000 in cash to Greenville on November 9, 1974. Upon receipt of the letter of credit, the option was to become irrevocable until November 9, 1974. [3] The letter of credit was to become null and void upon exercise of the option. The railroad cars were under lease to the Pittsburgh & Shawmut Railroad Company (P & S), and Greenville was to transfer the cars to GILCO upon termination of the lease in July 1975 if GILCO exercised the option. During the negotiations with Greenville, the GILCO partners discussed the possibility of obtaining title to the cars during the term of the P & S lease and of leasing the cars after the P & S *52 lease expired. After obtaining the option, petitioner tried unsuccessfully to arrange a lease of the cars to a business contact for future date. He then ran ads in the Wall Street Journal and contracted people who might be interested in purchasing or leasing the cars. [4] In letters dated between September 27, 1974, and October 11, 1974, petitioner followed up telephone calls with written offers to sell the cars for $7,100 per car or to lease them for $4.75 per car per day. On October 18, 1974, International Minerals and Chemical Corporation (IMC) responded to petitioner's September 27, 1974, letter by offering to purchase the cars for $7.025 per car, or a total of $3,856,725. On October 21, 1974, GILCO gave notice to Greenville that it planned to exercise the option to purchase the cars and would open the letter of credit securing the payment of $15,000 by November 9, 1974. On November 8, 1974, GILCO sold the cars upon which it has an option to IMC for $7,025 each. On the same day, GILCO notified Greenville that GILOCO was exercising the option to purchase the cars, and *53 thereafter the option became a purchase agreement. GILCO had a letter of credit issued to secure the purchase price. GILCO purchased no other railroad cars after that date. In keeping with a condition of the sales agreement between GILCO and IMC (sales agreement), IMC saw that two irrevocable letters of credit were issued, one to Greenville for $3,019,500, which satisfied GILCO's obligation under the purchase agreement (i.e., GILCO's cost of the cars) and another to GILCO for $837,225 (GILCO's profit). GILCO thus did not have to provide any cash for the purchase and sale of the cars. GILCO's sales agreement with IMC provided that delivery of the cars to IMC would be made as soon as the cars were released under the lease agreement with P & S, but no later than December 31, 1975. There was no provision in the sales agreement for a penalty against GILCO for failure to deliver. Under the sales agreement, IMC had the right to inspect the cars upon delivery, and, if they were found to be unacceptable for interchange under the Code of Rules, Association of American Railroads, Operations and Maintenance Department, Mechanical Division, revised 1963 (AAR Code of Rules), they could be *54 rejected. The purchase agreement between GILCO and Greenville also provided that at the time of delivery the cars would be acceptable for interchange under the AAR Code of Rules. On December 17, 1974, Greenville and GILCO amended the purchase agreement to provide that transfer of title to the cars would take effect as of November 1, 1974 (amended purchase agreement). Under the amended purchase agreement, Greenville warranted that, as of November 1, 1974, the cars were acceptable for interchange, but otherwise the cars were accepted by GILCO "as is where is." The amended purchase agreement also assigned Greenville's interest as lessor in the P & S lease to GILCO. Greenville warranted, however, that the aggregate rent payable under the lease would be sufficient to cover interest [5] and owner repairs and agreed to save GILCO harmless if the rent were not sufficient. Petitioner entered into the amended purchase agreement in order to gain some experience in leasing and owning railroad cars as well as to have better control over the maintenance of the cars during the lease period, because he recognized that used cars required close attention if they were to be maintained in proper *55 condition for timely delivery to IMC. Under the terms of the lease, the lessee was required to pay all taxes and assessments imposed on the lessee that might result in a lien on the cars unless contested in a manner that would not affect the lessor's title. The lessee was to see that the cars were kept in good repair and running condition and was to comply with AAR Code of Rules regarding use, maintenance and operation of the cars. Repairs required to comply with the rules were to be made and paid for by the lessee, unless they constituted "owner repairs" under the AAR Code of Rules. If the lessee failed to pay rent due or perform other obligations under the lease, the lessor could terminate the lease and take any appropriate legal action. As the cars were released from the P & S lease, GILCO delivered them to IMC in seven lots between July 10, 1975, and December 30, 1975, as follows: Date
Number of
Sales Price
Total Sales
Sold
Cars
Per Car
Price
08/09/75
52
$7,025
$ 365,300
10/18/75
72
7,025
505,800
10/24/75
66
7,025
463,650
11/10/75
20
7,025
140,500
12/01/75
111
7,025
779,775
12/22/75
40
7,025
281,000
12/30/75
20
7,025
140,000
Total
381
[6] $2,676,525
*56 Four additional cars were destroyed beyond salvage, and on July 10, 1975, P & S paid GILCO under a standard AAR formula $28,900, or $7,225 per car, pursuant to its lease obligation. One hundred thirty-seven additional cars could not be delivered in the proper condition by the time required under GILCO's sales agreement with IMC and were rejected by IMC. Petitioner threatened legal action against P & S but on March 31, 1976, GILCO and Greenville entered into an agreement (repurchase agreement) whereby Greenville repurchased the 137 rejected cars at the original sales price of $5,500 per car, indicating to petitioner that its motivation in doing so was to protect Greenville's significant business relationship with P & S. Under the repurchase agreement, GILCO was offered a minimum commission for efforts to sell the cars on behalf of Greenville under a nonexclusive marketing *57 agreement. In a transaction apparently related to efforts to sell some of the rejected cars, petitioner's partner, McGuire, signed a letter both for GILCO and far Gateway International, petitioner's sole proprietorship. Petitioner reported the gain from the sale of the cars to IMC as gain from the sale of an asset used in the trade or business of leasing railroad cars, which he claims resulted in capital gain here. In the statutory notice of deficiency, respondent reclassified the gain as ordinary income.
Respondent's position in support of its determination is that the railroad cars were property held primarily for sale to customers in the ordinary course of a trade or business and thus were excluded from capital gain treatment under section 1231(b)[7] and from the definition of a capital asset by reason of section 1221(1). Therefore, it is contended, profit from their sale gives rise to ordinary income. Petitioner argues that the cars were used in the trade or business of leasing railroad cars and that they were not held primarily for sale. For the reasons which follow, we find that the sale of the railroad cars resulted in ordinary income to the petitioner. *58 Section 1221 defines a capital asset broadly as "property held by the taxpayer," but limits this expansive language by excluding, inter alia, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 1231 provides preferential capital gain treatment for "property used in the trade or business," but also excludes property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The function of this exclusion, according to the Supreme Court, is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. [Citations omitted.] [Malat v. Riddell,383 U.S. 569, 572 (1966).] Accord, S & H, Inc. v. Commissioner,78 T.C. 234, 242 (1982). Thus the preferential capital gain treatment of sections *59 1221 and 1231 "applies to transactions in property which are not the normal source of business income." Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955). And, since this provision is an exception to the normal ordinary income tax requirements of the Code, "the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." Corn Products Refining Co. v. Commissioner,supra at 52. The determination of whether capital gain treatment is appropriate is ultimately a factual question, and the burden of proof is on the petitioner with respect to this issue. Rule 142(a); [8] see S & H, Inc. v. Commissioner,supra at 242. First, we hold that petitioner fails to qualify for the favorable treatment of section 1231 because the railroad cars do not constitute property used in petitioner's trade or business. Petitioner claimed on his return that the cars were used in his business of leasing railroad cars, but we do not believe that petitioner was in the leasing business. The *60 rental of the cars was pursuant to a preexisting lease that was not arranged by petitioner and was nothing more than a mere fortuity. Moreover, his rental of the cars was an interim proposition, since the ultimate sale was a foregone fact at the time of purchase from Greenville. Cf., Heebner v. Commissioner,32 T.C. 1162, 1170 (1959), affd. 280 F.2d 228 (3d Cir. 1960), cert. denied 364 U.S. 921 (1960). At the time the option was acquired by petitioner, the lease, dated May 1, 1964, was to terminate in July 1975--less than one year from the date of the option agreement. After obtaining the option, petitioner initially advertised the cars for sale or lease. IMC's response to petitioner's solicitation letter expressed a desire only to purchase the cars. Thus, by the time petitioner exercised his option to buy the cars in order to effect sale to IMC, it was clear that he had abandoned his leasing plans. The transfer of title to the cars and the assignment of the lease pending delivery of the cars to IMC was a subsequent occurrence primarily designed to protect the sale. [9] For these reasons, we do not believe that petitioner was *61 in the business of leasing railroad cars.
Petitioner also argues that the instant transaction should not be excluded from capital gain treatment under either section 1221 or 1231 because the rental shows that the cars were not "property held * * * primarily for sale." But we believe that petitioner held the cars primarily for sale within the meaning of these sections. As the Supreme Court in Malat v. Riddell,supra, has instructed us, the term "primarily" means "of first importance" or "principally," rather than merely "substantially." Under this test, we find petitioner's assertions that his "primary intent in acquiring the cars was to lease them" to be quite unpersuasive. Petitioner's contract of sale to IMC specifically referred to (and incorporated) the option to purchase the cars, making it clear that petitioner's purchase and resale were interdependent. On these facts, when viewed *62 in the light of economic reality, we believe that the existence of a contract to sell the cars at the time of purchase requires the conclusion that the "primary" purpose of buying these railroad cars was for resale. See Heebner v. Commissioner,supra at 1170. Petitioner's self-serving statements to the contrary fail to negate that conclusion. [10] There is simply no evidence to corroborate petitioner's statement that he purchased the cars because of the preexisting lease. See South Texas Rich Warehouse Co. v. Commissioner,336 F.2d 890, 897-898 (5th Cir. 1966), cert. denied 386 U.S. 1016 (1967). Therefore, the cars were held primarily for sale within the meaning of sections 1221 and 1231. *63 But in order to be excluded from the definition of a capital asset the cars also must have been held for sale in the course of petitioner's business. Petitioner argues that his activities with respect to the railroad cars were not part of his existing business, because the structure of the instant transaction as a purchase and sale differed substantially from his activities in his existing business, where he sold property on behalf of others for a commission. He further contends that his existing business was not dealing in personal property and that it involved different products in a different market from the instant transaction. Respondent, on the other hand, contends that the purchase and sale of the railroad cars was in substance so similar to petitioner's existing business that it should be considered to be a part of it--or at least an enlargement or modification of that business. We note initially that petitioner's ownership of the railroad cars was technically by means of a one-half interest in GILCO, a partnership. The record contains no evidence as to the reason why the instant transaction was effected through a separate entity from the sole proprietorship through *64 which he conducted his business. We find, however, that the existence of the partnership entity is not material for purposes of the instant discussion--and the parties apparently were of the same view, as their briefs contain virtually no discussion of its relevance. [11]
We have held in previous cases that the existence of a trade or business for various purposes is to be determined at the partnership level. E.g., Brannen v. Commissioner,78 T.C. 471, 501-505 (1982), on appeal (11th Cir., August 23, 1982); Goodwin v. Commissioner, affd. without published opinion 691 F.2d 490 (3d Cir. 1982); Madison Gas & Electric Co. v. Commissioner,72 T.C. 521 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *65 Podell v. Commissioner,55 T.C. 429 (1970). See Estate of Freeland v. Commissioner,393 F.2d 573, 584 (9th Cir. 1968); Bachler v. United States,231 F. Supp. 138, 140 (D. Minn. 1964); Fishback v. United State,215 F. Supp. 621, 625-626 (D. S.D. 1963). [12] This rule--which we reaffirm here--is based upon the familiar principle enunciated by the Supreme Court in United States v. Basye,410 U.S. 441, 448 (1973), that "the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners" for purposes of determining the character of partnership income. See section 702(b). [13] Thus in Brannen v. Commissioner,supra at 505, we held that, in determining whether an activity was engaged in for profit within the meaning of section 183, profit motive should be analyzed at the partnership level. In Madison Gas & Electric Co. v. Commissioner,supra at 564-565, we held that the businesses of the partners could not be imputed to the *66 partnership to transform nondeductible start-up costs of the entity into deductible business expenses of the partners. And in Goodwin v. Commissioner,supra at 432-439, we reaffirmed our Madison Gas holding with regard to similar pre-business expenses. *67 Our present comparison of petitioner's business activities in and outside of the partnership is fully consistent with those cases, because we here focus not upon whether the activities of GILCO rose to the level of a trade or business as in these cases--we will address that question later. Rather, our present emphasis is upon petitioner's intent: specifically, we are inquiring whether he intended by purchasing and selling these railroad cars to continue in an expanded form of his existing business or to enter into a wholly separate investment endeavor. Therefore, it is completely appropriate for us to examine petitioner's activities in both his existing business and the partnership to ascertain whether they were so similar that they constituted one business. [14]
*68 The partnership was not merely an investment by petitioner in a completely unrelated venture. It was in reality no different from his existing commission business, largely because in the activities of GILCO petitioner did not bear any risks of ownership. The purchase and sale for the cars were structured so that at no point did petitioner or GILCO have to supply any cash to finance the transaction; petitioner thus was not subject to a cash flow risk. Petitioner's sales contract with IMC provided that petitioner would sell as many cars as it could deliver by a certain date; therefore there was no risk of as suit by IMC for nondelivery. While petitioner makes several conclusory claims concerning the "contingent" nature of his contract, we fail to see how he could possibly be subject to the rise and fall of the marketplace when he sold the cars simultaneously with his purchase of them. At the time of that sale, petitioner's purchase agreement with Greenville required that the cars be acceptable for interchange upon delivery, which was the condition in which they had to be delivered to IMC. Thus, if any of the cars were unacceptable, petitioner had a contract claim against Greenville. *69 But even if viewed from petitioner's perspective after the retroactive amendment to the purchase agreement when the lease was transferred to petitioner, petitioner's risk was nonexistent. It is true that his sales agreement was subject to IMC's right to refuse any cars that were not maintained in a certain condition during their rental to P & S, but in the event that P & S did not comply with its obligations under the lease, petitioner plainly had rights under his lease to terminate and sue for damages, showing in such a suit his losses in connection with his inability to perform under his sales agreement with IMC. [15] In addition, petitioner's maintenance obligations were substantially mitigated by Greenville's promise to petitioner that, in the event its lease payments did not exceed certain costs, Greenville would cover the difference. The evidence also shows that the payment by the lessee for destroyed cars in fact exceeded the purchase price paid by IMC, so that even total destruction of all the cars could have generated a profit for petitioner, despite his inability to deliver to IMC. *70 This virtually risk-free nature of the purchase and sale makes it very similar to petitioner's commission arrangements in his existing business, where his profit was assured and similarly was due solely to the personal services he performed in putting together a willing buyer and seller. Cf. Commissioner v. P.G. Lake, Inc.,356 U.S. 260 (1958) (substitute for ordinary income is not capital investment). Thus the facts here are closely analogous to those in Heebner v. Commissioner,32 T.C. 1162 (1959), affd. 280 F.2d 228 (3d Cir. 1960), cert. denied 364 U.S. 921 (1960), where the taxpayer was in the building and construction business. In the course of the project at issue, the taxpayer essentially engaged in "package building:" he selected the site of a warehouse, assisted in its design and negotiated its lease, obtained financing and supervised its construction. The taxpayer technically owned the project for a time, but had made arrangements to sell the completed project from the beginning. He also collected some rent under an interim rental arrangement. This Court held: * * * To us it is clear that the transaction *71 was part of the petitioner's continuing business. That it might have been a unique transaction, in that George had not over the years engaged in a large number of transactions involving exactly the same factual situations, does no control. * * * * * * In many ways, the income involved herein was income earned from personal services of the taxpayer rather than from a capital transaction and should be taxed as such. We find nothing in the record which would justify a finding that George ever intended this project solely as an "investment" transaction and not as one where the eventual disposition was not in his usual course of business. True, he did collect some rentals from Nash-Kelvinator, but this was only an interim proposition--the ultimate sale to Prudential was a foregone fact--it had been arranged by and on behalf of George and agreed upon from the beginning. * * * We think that George was in the business of doing just what was done here * * *. [Heebner v. Commissioner,supra at 1169-1170.] [16]
See also Margolis v. Commissioner,337 F.2d 1001, 1006-1007 (9th Cir. 1964), modified on other grounds, 339 F.2d 537 (9th Cir. 1964). *72 [17]
*73 Therefore, we find that the purchase and sale of the railroad cars constituted an extension of petitioner's existing business. [18]
Petitioner alternatively claims that the transaction did not constitute a separate, independent trade or business because it was an isolated, speculative, nonrecurring sale, which is not properly treated as a trade or business. Commissioner v. Williams,256 F.2d 152 (5th Cir. 1958), revg. a Memorandum Opinion of this Court; Thomas v. Commissioner,254 F.2d 233 (5th Cir. 1958), revg. 28 T.C. 1 (1957). Respondent contends, on the other hand, that the instant transaction did *74 constitute a trade or business in its own right and that capital gain treatment is inappropriate because, where property is acquired specifically for sale pursuant to a preexisting sale arrangement, that property is held for sale in the ordinary course of a trade or business. S & H, Inc. v. Commissioner,78 T.C. 234 (1982). For purposes of completeness we will deal with these contentions.
In determining whether a trade or business exists, each case necessarily will turn upon the totality of circumstances. Jersey Land & Development Corp. v. United States,539 F.2d 311 315 (3d Cir. 1976). In examining these circumstances, the courts have, over the years, developed a series of factors that have proven to be helpful in determining whether a particular endeavor rises to the level of a trade or business. These factors include the purpose for which the taxpayer acquired and held the property, the extent of improvements made to facilitate its sale, the activity of the taxpayer in promoting sales, the frequency and continuity of sales, the length of time the property *75 was held between purchase and sale, and the relative income to the taxpayer from the sale of the property, compared with his other income. Cousins Properties, Inc. v. United States, an unreported case, 40 AFTR 2d 77-5262, 77-5265, 77-2 USTC par. 9508 (Ct.Cl. Trial Div. 1977). See Biedenharn Realty Co., Inc. v. United States,526 F.2d 409, 415-420 (5th Cir. 1976); United States v. Winthrop,417 F.2d 905, 910 (5th Cir. 1969); Heebner v. Commissioner,supra at 1170. After a careful examination of the facts in this case, we find that petitioner's activities in connection with the railroad cars rose to the level of a trade or business. The evidence clearly shows that petitioner exercised a good degree of personal effort and control over the purchase and sale of the railroad cars. [19] Petitioner also was active in the maintenance of the railroad cars during the period between the exercise of the option on November 8, 1974, and final delivery to IMC in December 1975. [20] The fact that there was such a short period of ownership of the cars also is indicative of business rather than investment behavior. See *76 Tidwell v. Commissioner,298 F.2d 864, 866 (4th Cir. 1962). With regard to frequency of sales, while there was only one sales contract with IMC, the seven separate deliveries of the railroad cars to IMC were treated by the parties as separate "sales." And, when some of the cars were rejected by IMC because they had been inadequately maintained, petitioner threatened to sue P & S until he worked out the repurchase agreement with Greenville. When viewed together, all of these facts show a substantial degree of involvement by petitioner in the purchase, maintenance and sale of the railroad cars and a distinct lack of passive "investment" intent or behavior. These facts lead us to conclude that petitioner was engaged in the trade or business of selling railroad cars. *77 The primary cases upon which petitioner relies in support of his position that the instant sale does not constitute a separate business are Commissioner v. Williams,256 F.2d 152 (5th Cir. 1958), revg. a Memorandum Opinion of this Court; and Thomas v. Commissioner,254 F.2d 233 (5th Cir. 1958), revg. 28 T.C. 1 (1957). A more recent case relies on the same principles. Reese v. Commissioner,615 F.2d 226 (5th Cir. 1980), affg. a Memerandum Opinion of this Court. These cases are described by petitioner as standing for the proposition that-- A single purchase and sale by a partnership that never contemplated any other purchase is "a non-recurring speculative venture" that does "not constitute a trade or business of either [the partner] or the partnership" and it not a sale in the ordinary course of a trade or business. We do not believe that petitioner's broad characterization of these cases is correct, nor do we find that they control this case. Williams involved the purchase of a partially completed tankship which the taxpayer planned to complete and sell for profit. The Court of Appeals found that *78 the "purchase and sale of the vessel was a non-recurring speculative venture," which did not rise to the level of a trade or business. Commissioner v. Williams,supra at 155. Similarly, in Thomas the taxpayer invested in an assembly of mineral-producing lands which he sold as a unit to a mining company. The Court of Appeals also found that this was a "speculative investment" entitled to capital gain treatment. Thomas v. Commissioner,supra at 237. In Reese the taxpayer controlled a manufacturing corporation and arranged for construction of a new plant with his own funds, which upon completion he planned to sell and lease back to the corporation. Before the plant was finished the corporation went bankrupt, and the partially completed plant was sold at a sheriff's sale for considerably less than its cost. The Court of Appeals held that the loss was a capital loss because the project did not rise to the level of a separate trade or business. Reese v. Commissioner,supra at 230-231. [21]
*79 We believe that these cases are quite distinguishable from the instant situation. First, in none of these cases was the "non-recurring" venture in any way related to the taxpayer's existing business. In Williams and Reese the taxpayers who invested in the properties were corporate executives while in Thomas the real estate investor operated a ranch. [22] In contrast, petitioner was in a business field that was not only very related to the instant transaction but, we have found, was essentially the same business, albeit in a slightly expanded form. This distinction is crucial, because the "non-recurring" aspect of the trio of cases just discussed was based upon the fact that there was-- neither prior or subsequent activity on [the taxpayer's] part in this field of endeavor, nor an intention to devote his time and effort in the future to activities in this field. [Reese v. Commissioner,supra at 231.] *80 A second distinction involves the degree of activity on the part of the taxpayers in the project under scrutiny. Petitioner's day-to-day efforts appear to have been much more extensive than those of the taxpayers in those cases. In Williams, for example, completion of the tankship--the only substantial activity that appeared to take place during the taxpayer's ownership--was contracted out to a third party who was responsible for the ship's timely completion prior to sale. Commissioner v. Williams,supra at 153-154. In Thomas, the taxpayer merely held adjacent parcels of land for about three years and sold them as a unit after performing no improvements and (the court found) expending a small amount of time on the project. Thomas v. Commissioner,supra at 235, 237. The Tax Court in Reese had found that the taxpayer had done no more than finance the project. Reese v. Commissioner,supra, 35 T.C.M. at 1235. [23]
*81 A third distinguishing aspect of Thomas and Williams is that the Court of Appeals in both cases clearly rested its decisions in part on the "speculative" nature of the project. See Commissioner v. Williams,supra at 155; Thomas v. Commissioner,supra at 237. In view of petitioner's preexisting sales arrangements at the time he purchased the railroad cars, he clearly cannot be said to have engaged in a speculative venture. In S & H, Inc. v. Commissioner,supra, this Court recently distinguished Williams because evidence of a preexisting arrangement to sell [24] the property indicated that it could not have been held "passively for investment or for long-term appreciation in value." S & H, Inc. v. Commissioner,supra at 244. Therefore, the Court concluded, capital gain treatment was not appropriate. Courts in other cases have held to the same effect. [25] See DeMars v. United States,27 AFTR 2d 71-925, 71-1 USTC par. 9288 (S.D. Ind. 1968); Heebner v. Commissioner,supra.
*82 The rationale for the holding in S & H is that capital gain treatment protects capital investors: those who purchase property with a view to hold it passively for investment or for long-term appreciation in value. S & H, Inc. v. Commissioner,supra at 244; Zack v. Commissioner,25 T.C. 676, 681 (1955), affd. 245 F.2d 235 (6th Cir. 1957). [26] The purchase of property with the intent to hold it until market forces (as opposed to taxpayer's efforts) increase its value is indicative of investment behavior. [27] See DeMars v. United States,supra at 71-929. Inherent in this "investment" purpose is the existence of risk. In S & H, this Court noted that the transaction "cannot be viewed as a 'speculative venture" (78 T.C. at 245), because the taxpayer had no risk--there was a contract requiring the purchaser to take the property and, most importantly, the sales price was not determined until after all of the taxpayer's costs could be calculated, thereby ensuring him a profit. S & H, Inc. v. Commissioner,supra at 245. We have found the same to be true here and thus believe *83 S & H is controlling. We therefore are compelled to conclude that petitioner's purchase, maintenance, and sale of the railroad cars rose to the level of a trade or business. Finally, because petitioners have *84 not proved that any of the railroad cars constituted either property used in the trade or business or capital assets, petitioners are not entitled to the benefits of section 1231(a) to the extent that they may have gain from the involuntary conversion of the four destroyed cars. For these reasons, petitioner's claim for capital gain treatment will be denied. Commission Deduction
In the course of petitioner's business as a marketing agent, Mr. Joe Larcena acted as petitioner's representative in the Philippines, helping petitioner to sell U.S. goods to clients there. Petitioner paid Mr. Larcena a percentage of the commission received by petitioner for his services in arranging sales. In addition to a close business relationship between the two men, Mr. Larcena was a personal friend of petitioner. Petitioner testified that Mr. Larcena preferred to be paid his commissions in cash and did not want a statement calculating the amount of commissions due him, because Mr. Larcena did not want people in the Philippines to know how much money he was receiving. On October 18, 1972, Mr. Larcena asked petitioner in writing to advance $20,000 to him, to be repaid out of commissions *85 to be earned in the future. While at the bank, petitioner paid $20,000 in cash to Mr. Larcena, who had requested that the money be paid in that form. Petitioner viewed the arrangement as a loan, although payment of interest was not discussed at any time. The loan was not evidenced by a note or any other document. Petitioner did not deduct the $20,000 paid to Mr. Larcena as an expense on his 1972 return, and he did not carry this loan on his financial statements as a receivable or in any other way document its existence. By 1976, the loan had not been paid back, and petitioner deducted during that year $20,000 from the Commissions owed to Mr. Larcena. He reflected this on his business tax return for 1976 by treating the $20,000 as a deductible Commission paid to Mr. Larcena, despite the fact that this sum was not actually paid to Mr. Larcena. Petitioner is a cash basis taxpayer. Mr. Larcena passed away in 1977. It is respondent's position that this deduction was not allowable because there are no records to indicate either that the loan ever existed or that, even if it did exist, it was not paid back in a prior year. He further contends that, because there are no records *86 documenting commissions paid specifically to Mr. Larcena, there is no way to verify whether the $20,000 deducted in 1976 was related to the Larcena loan or not. Thus, it is respondent's view that petitioner's testimony is insufficient to support the deduction. We do not agree. While Mr. Larcena's written request to petitioner for the loan is not concrete proof that the loan actually was made, it certainly provides a believable foundation for petitioner's testimony, which we found to be quite credible. Petitioner was very specific in his recollection of the transactions concerning Mr. Larcena and conveyed a picture that was distinctly believable. Petitioner's timing of the repayment also made sense: he explained that in 1976 business had fallen off somewhat in the Philippines, making that year particularly appropriate for closing out the loan. Moreover, petitioner's rather informal procedure for handling the repayment on his books was consistent with his characterization of this as a personal loan to a friend. Petitioner has met his burden of proving that the commission deduction was appropriate. Decision will be entered under Rule 155.
Footnotes
1. Petitioner and McGuire made Gateway International Leasing Company (Gateway) GILCO's corporate agent and nominee. Petitioner was president of Gateway, and McGuire was its counsel and vice president. Gateway negotiated many of the pertinent transactions for GILCO until, on Nov. 1, 1974, Gateway assigned all of its rights to GILCO and was liquidated. Because we attached no significance to Gateway's temporary existence in examining the instant issue, we will refer only to GILCO in describing these transactions.↩
2. The purchase price later was increased to $5,555 per car. ↩
3. The option provided no penalty for failure to supply the letter of credit, although until the letter of credit was supplied the option apparently was revocable.↩
4. Petitioner testified: "I think we talked to every railroad and operator in the United States."↩
5. GILCO was required, under the amended purchase agreement, to pay interest of 1 percent per month to Greenville on the deferred purchase price of the cars between Dec. 1, 1974, and the date of payment (to be made after delivery), so long as rental payments were made under the lease.↩
6. Although the evidence does not show whether payment was in fact made, GILCO's sales agreement with IMC provided that IMC, upon delivery of the cars to it, would make appropriate payments to Greenville and to GILCO. In the absence of evidence to the contrary, we assume that this provision was carried out.↩
7. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
8. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
9. The sale was protected in that the day-to-day control by petitioner as lessor of the cars enabled him to ensure that they were adequately maintained during the rental period.↩
10. The only possible support for petitioner's assertions that he purchased the cars to lease them lies in the fact that, after he exercised the option to purchase them, petitioner was assigned Greenville's interest as lessor of the cars. Petitioner testified that he did so in order to be involved in the lease" and to have "a better control of our destiny." His "destiny" was to deliver as many cars as possible after the lease expired in a certain condition, and thus we find that his intent in becoming sublessor of the cars was to oversee their maintenance. Moreover, title to the cars and the leasehold interest did not pass until after the option to purchase was exercised, and this subsequent modification does not affect petitioner's original intent.↩
11. Petitioner in his brief used the term "petitioner" to refer "both to Stephen Baumgart and the general partnership of which he was a general partner," while respondent merely stated that "it is irrelevant whether GILCO is viewed as Baumgart's alter ego or as a separate entity," "because the cars were not purchased for investment.↩
12. Other cases involving special circumstances, however, do not follow this general rule and look to the activities of the partners in determining whether the partner is entitled to capital gain upon the sale of partnership property. E.g., Riddell v. Scales,406 F.2d 210, 212-213 (9th Cir. 1969); Margolis v. Commissioner,337 F.2d 1001 (9th Cir. 1964), modified on other grounds 339 F.2d 537 (9th Cir. 1964); Rosebrook v. United States,191 F. Supp. 356 (N.D. Cal. 1960), affd. 318 F.2d 316 (9th Cir. 1963). See Bauman v. Commissioner,T.C. Memo. 1964-179↩ (court declined to determine whether characterization should be made at partner or partnership level where petitioner did not meet burden of showing absence of trade or business at either level). 13. Sec. 702(b) provides in pertinent part that-- [T]he character of any item of income * * * included in a partner's distributive share * * * shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.↩
14. We also note that petitioner possessed a one-half interest in the partnership, whereas his business was technically a sole proprietorship. However, there is reason to believe that petitioner's partner, McGuire, was involved in petitioner's existing business as well. For example, a letter dated April 7, 1976, apparently related to efforts to sell some of the rejected cars, is signed by Mr. McGuire for GILCO (the partnership) andGateway International Company (petitioner's sole proprietorship). Similarly, petitioner described McGuire as a man with whom he "did business." The evidence also indicates that petitioner was the dominant GILCO partner in that his business was the source of the original purchase of the cars and that petitioner negotiated most of the transactions involving the purchase and sale of the cars. Although we do not find petitioner's 50 percent ownership in the partnership to be wholly without any significance, we believe that it is not controlling for purposes of the question before us, because petitioner's close business ties in (and control over) both the sole proprietorship and the partnership were substantial, even though the technical ownership percentages were not identical. See Margolis v. Commissioner,337 F.2d at 1005-1007↩.
15. In fact, petitioner testified that he was "threatening legal action" with the lessee when Greenville decided to intervene and repurchase the rejected cars.↩
16. While the taxpayer in Heebner v. Commissioner,32 T.C. 1162 (1959), affd. 280 F.2d 228 (3d Cir. 1960), cert. denied 364 U.S. 921 (1960), occasionally had engaged in "package building" on previous occasions, he argued that the instant arrangement was different because he technically owned the project for a time. 32 T.C. at 1169-1170. But we found that "he did not own it. His ultimate design was to build this particular warehouse for sale and that is what actually happened." 32 T.C. at 1170↩. 17. See Spencer v. Commissioner,T.C. Memo. 1980-126↩, where the taxpayer was in the business of raising wrecked boats for a fee. During the year at issue he raised a tugboat and received the boat as compensation. He made repairs on its and sold it for a substantial sum, which the taxpayer argued to be capital gain. We found instead that "the presence of only one episode in which petitioner refurbished a boat for resale is not particularly telling" and that the instant transaction was "part and parcel of a broad operation that in and of itself constitutes a trade or business." 40 T.C.M. at 190 and n.2, 49 P-H Memo T.C. 80,126 at 652-80.
18. Nor are we persuaded by petitioner's attempted distinction between railroad cars marketed in the United States and other heavy equipment marketed abroad as a justification for viewing this transaction as other than a part of his existing business. This erroneously assumes that his business should be narrowly defined to include only those pieces of equipment that he theretofore had sold in only foreign markets. We decline to so circumscribe petitioner's business in the absence of evidence explaining the reason to do so.↩
19. He testified, for example, that he engaged in leasing negotiations prior to obtaining the option, although that arrangement later did not work out. Correspondence concerning the option contains his signature and refers to ongoing negotiations. Petitioner also personally solicited potential purchasers or lessees of the cars before the option was exercised and testified: "I think we talked to every railroad and operator in the United States." Additionally, he appears to have negotiated the sale to IMC and the subsequent exercise of the option.↩
20. Petitioner stated that he decided to become the lessor of the cars during that interim period in order to have "better control of our destiny" and because "it was a chance to obtain them with an ongoing lease and to be involved in the lease with them."↩
21. The court additionally found that the plant did not constitute "real property used in the taxpayer's trade or business," excluded from the definition of a capital asset under sec. 1221(2) of the Code, because it was not to be used in the taxpayer's "business of a corporate executive." Reese v. Commissioner,615 F.2d 226, 231↩ (5th Cir. 1980).
22. The court in Thomas v. Commissioner,254 F.2d 233, 235 (5th Cir. 1958), revg. 28 T.C. 1↩ (1957), specifically noted that, although the taxpayer technically was a registered real estate broker, he "did not engage in the business of real estate broker."
23. While the Court of Appeals in Reese declined to review this finding, it did state that even assuming arguendo that the taxpayer had been the builder, developer and general contractor of the project, its nonrecurring nature would control its decision. Reese v. Commissioner,supra↩ at 230. Thus the significance attributed by the Court of Appeals to the taxpayer's activity in that case is unclear.
24. In S & H, Inc. v. Commissioner,78 T.C. 234 (1982), the taxpayer purchased land apparently for investment purposes and held it out for lease only. He entered into an arrangement with a lessee whereby the taxpayer constructed a warehouse on the property according to the lessee's specifications and then leased the land and warehouse to the lessee, granting him an option to purchase the property. On audit, the IRS and the taxpayer stipulated that this arrangement for tax purposes was an installment sale. S & H, Inc. v. Commissioner,supra↩ at 236-238. 25. Indeed, courts regularly have even held that, where a taxpayer offered his property for sale shortly after he purchased it, the short duration of ownership indicates that the property was not bought for investment purposes. E.g., Tidwell v. Commissioner,298 F.2d 864, 866 (4th Cir. 1962); DeMars v. United States,27 AFTR 2d 71↩-925, 71-1 USTC par. 9288 (S.D.Ind. 1968).
26. Investment intent is present where a person purchases property with the expectation of reselling it at a profit that came about "because of a rise in value during the interval of time between purchase and resale;" those who sell to customers in a trade or business, on the other hand, also purchase with a plan to resell at a profit, but that profit occurs because the taxpayers "have or hope to find a market of buyers who will purchase from them at a price in excess of their cost." Kemon v. Commissioner,16 T.C. 1026, 1032↩ (1951). 27. This is not to say, however, that capital gain treatment always will be denied where the taxpayer's activities--not market appreciation--contributed to much of the gain. But the fact that a substantial amount of the appreciation is due to taxpayer's efforts is a significant factor. Buono v. Commissioner,74 T.C. 187, 205 n.25 (1980); Newman v. Commissioner,T.C. Memo. 1982-61↩.