863 F.2d 263
 63 A.F.T.R.2d 89-344, 63 A.F.T.R.2d
89-679, 88-2 USTC P 9601
 PLEASANT SUMMIT LAND CORPORATION, Appellant in 88-1373,
v.
COMMISSIONER OF INTERNAL REVENUE.
George PRUSSIN and Sharon Prussin, Appellants in 88-1377,
v.
COMMISSIONER OF INTERNAL REVENUE.
 Nos. 88-1373, 88-1377.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 7, 1988.
Decided Nov. 25, 1988.
Opinion on Denial of Rehearing in No. 88-1377 Jan. 30. 1989.
 
 Paul Windels, Jr. (argued), John Y. Taggart, Clayton A. Prugh, Windels, Marx, Davies & Ives, New York City, for appellants.
 William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen (argued), Michael J. Roach, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellee.
 Before HIGGINBOTHAM, MANSMANN and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 Appellants, Pleasant Summit Land Corporation (PSLC) and George and Sharon Prussin, appeal from adverse decisions entered by the Tax Court following a consolidated trial on their petitions to redetermine deficiencies determined by the Commissioner of Internal Revenue. PSLC challenges the Tax Court's conclusion that it was a "personal holding company" subject to the tax on personal holding companies in its tax year in issue. Resolution of its appeal depends on whether its sale of the Summit House apartments in West Orange, New Jersey, was of a capital asset and thus resulted in a capital gain or whether the Summit House was a property it held primarily for sale to customers in the ordinary course of its trade or business so that its sale resulted in ordinary gross income.
 
 
 2
 George Prussin is an investor in a limited partnership, Pleasant & Summit Associates (PSA), which indirectly purchased Summit House from PSLC. The Prussins challenge the Tax Court's conclusions that: (1) nonrecourse financing of the Summit House purchase exceeded its fair market value; (2) the nonrecourse financing would not support depreciation and interest deductions which they claimed by reason of George Prussin's limited partnership interest in PSA; and (3) these deductions would be disallowed in full rather than only to the extent that they were the product of financing in excess of the fair market value of Summit House. Furthermore, they argue that the complete disallowance of the deductions unconstitutionally violated their right to due process of law.
 
 
 3
 This court has jurisdiction under section 7482(a) of the Internal Revenue Code of 1954.[1] The Tax Court had jurisdiction under I.R.C. Secs. 6213(a), 6214(a), and 7442. Inasmuch as PSLC was a New Jersey corporation with its principal place of business in New Jersey when it filed its petition and filed its appeal to this court and the Prussins were a married couple residing in New Jersey at all times relevant to their petition and appeal, the venue for these appeals properly lies in this court.[2]
 
 
 4
 We will affirm the Tax Court's decision with respect to PSLC. We will reverse the Tax Court's decision to the extent it completely disallowed the Prussins' deductions and will remand for a determination of the fair market value of Summit House and for calculation of the appropriate deductions allowable to the Prussins. Since we hold that the Prussins' deductions may be disallowed only in part, their constitutional claim is moot and we do not address it.
 
 I. BACKGROUND
 A. The Underlying Business Transaction
 
 5
 On May 3, 1978, in an arm's length transaction, PSLC entered into an agreement to purchase the Summit House, a property on Summit Street, West Orange, New Jersey, containing two apartment buildings and a small separate resident manager's apartment for $4,200,000. The purchase was closed on or about June 1, 1978 and the consideration was paid by $250,000 in cash, by delivery of a $1,350,000 note secured by a purchase money mortgage, and by PSLC taking title subject to a previously existing $2,600,000 nonrecourse mortgage.
 
 
 6
 Contemporaneously with the purchase, PSLC created a wholly owned subsidiary, Mount Orange Realty Corp. (MORC), to which it then sold the Summit House buildings while retaining the land beneath them. The sale price to MORC was $5,200,000, consisting of $500,000 in cash which MORC borrowed or owed and a $4,700,000 nonrecourse mortgage which wrapped around and was subject to the prior two mortgages.[3] The note which this mortgage secured permitted accumulation of interest and principal through December 31, 1988, except that annual interest payments were required up to the available cash flow. This conveyance of the property placed the depreciable buildings in one entity while leaving the nondepreciable land in another.
 
 
 7
 PSLC then sold its MORC stock to the newly created PSA, which was organized to acquire the Summit House, for $2,559,200, paid in the form of a nonrecourse note secured by the MORC shares, for which a mortgage of Summit House to PSLC was immediately substituted. This note had provisions for accumulation of interest and principal through December 31, 1988, similar to those in the $4,700,000 note. PSA then dissolved MORC, took direct ownership of the Summit House buildings and took over MORC's obligations including the $500,000 due on the purchase of the Summit House and the $4,700,000 nonrecourse wraparound mortgage. Thus, the cost to PSA for acquisition of Summit House was the $2,559,200 indebtedness for the purchase of the MORC shares, assumption of MORC's $500,000 obligation, and assumption of MORC's $4,700,000 nonrecourse wraparound mortgage for a total of $7,759,200. The record, however, does not clearly establish that PSA paid the $500,000. Of course, this assumption of obligations did not transform the nonrecourse debts to recourse obligations. The consequence of these transactions was to leave PSA with large debts with interest charges and a substantial depreciable asset, a situation setting up the possibility for it to claim large tax deductions. Additionally, PSLC leased the land under the buildings to PSA for $10,000 a year under an agreement allowing rent to be accumulated and deferred at a fixed rate of interest. This provision caused PSA to generate additional tax deductions for the interest which accrued on the unpaid rent.
 
 
 8
 PSA sold thirty limited partnership units to a group of investors including George Prussin for a total of $1,980,000 paid with down payments and subsequent installments. The offering memorandum to the investors indicated that the $500,000 due on the sale from PSLC would be paid from the investors' down payments, leading the Commissioner in his brief to indicate that it appears that MORC's $500,000 obligation for its down payment was satisfied from the investors' funds. Inexplicably, the agreement for sale of the MORC shares between PSLC and PSA included a warranty by PSLC that MORC had no liabilities. Some months after PSA acquired Summit House, a new nonrecourse mortgage was substituted for the prior $2,600,000 mortgage but this did not enhance PSA's risk in the transaction. Most of the foregoing transactions were nearly contemporaneous and thus they formed part of one large structured undertaking.
 
 
 9
 PSA reported losses on its income tax returns for 1978 and 1979, and later years, largely attributable to interest deductions and depreciation. These losses were passed through to the limited partners who used them to off-set income on their individual tax returns. On December 19, 1985 an unrelated third party purchased the Summit House land from PSLC and the buildings and lease from PSA for a total of $7,000,000.
 
 
 10
 B. The Assessment of Deficiencies Against PSLC
 
 
 11
 On its corporate income tax return for its taxable year ending May 31, 1979, PSLC indicated that: (1) it had realized a gain of $3,742,704 on the sale of certain improvements to land in West Orange, New Jersey (Summit House); (2) it elected to use the cost recovery method for reporting this profit; and (3) under this method none of the gain was includable in its gross income for the taxable year covered by the return.
 
 
 12
 On October 7, 1982, the Commissioner issued a deficiency notice to PSLC. This notice stated that: (1) PSLC was required to recognize gain on the sale of its real property in the year of the sale;[4] (2) PSLC was not entitled to use the cost recovery method of accounting; (3) under the installment method of accounting, which PSLC had elected as an alternative to the cost recovery method, PSLC was required to report a gain in the amount of $464,069 for the taxable year ending May 31, 1979; (4) the $464,069 sum was a capital gain to PSLC in the taxable year ending May 31, 1979; (5) PSLC was a "personal holding company" because more than sixty percent of its adjusted ordinary gross income was from interest because the $464,069 was a capital gain and not ordinary income, and (6) inasmuch as PSLC was a personal holding company it owed an additional $106,832 under the personal holding company tax imposed by I.R.C. Sec. 541.
 
 
 13
 C. The Assessment of Deficiencies Against the Prussins
 
 
 14
 The Prussins reported a loss of $417,012 from George Prussin's distributive share of the 1978 losses of PSA on their joint federal income tax return for 1978, and a loss of $345,170 from George Prussin's distributive share of PSA's 1979 losses on their 1979 income tax return. On April 22, 1985, the Commissioner issued a deficiency notice to the Prussins entirely disallowing his share of the partnership losses on the ground that the Prussins had not established the amount and character of any of the partnership items on which their individual loss claims were based.
 
 D. This Litigation
 
 15
 PSLC and the Prussins brought these actions challenging the Commissioner's deficiency notices. Prior to the consolidated trial, PSLC conceded all issues other than its status as a personal holding company. A trial then ensued before Judge Cohen of the United States Tax Court whose opinion is reported as Pleasant Summit Land Corporation v. Commissioner, T.C.M. (CCH) 1987-469 at 566-76 (Sept. 17, 1987) [hereinafter PSLC ]. Judge Cohen held that PSLC qualified as a personal holding company subject to the personal holding company tax and, accordingly, she upheld the Commissioner's assessment of a $236,840 deficiency for PSLC's taxable year ending May 31, 1979. On this appeal PSLC challenges the Tax Court's finding that PSLC was a personal holding company, though it does not contend that, if it was a personal holding company, the assessment was erroneously calculated.
 
 
 16
 Judge Cohen determined that the Prussins had deficiencies for their taxable years ending December 31, 1978, and December 31, 1979, respectively, of $264,571.00 and $141,496, attributable to her sustaining the disallowance of deductions that PSA passed through to its limited partners including the Prussins.[5] The disallowance of PSA's deductions was based on Judge Cohen's factual finding that the nonrecourse debt underlying its purchase of Summit House was greater than its fair market value, which did not exceed $4,200,000. The judge held that as a matter of law nonrecourse indebtedness in excess of fair market value would not support deductions for either depreciation or interest payments as there was no investment in the property and no genuine indebtedness for its purchase. She explained that no depreciable basis in Summit House had been established and consequently no portion of the nonrecourse indebtedness would support tax deductions. On appeal the Prussins challenge Judge Cohen's findings of fact, her application of legal standards, and the constitutionality of the legal standards applied.
 
 II. THE STANDARDS OF REVIEW
 
 17
 This court has plenary review of the Tax Court's construction of the Internal Revenue Code. See Minizza v. Stone Container Corp., 842 F.2d 1456, 1459 (3d Cir.1988); Creque v. Luis, 803 F.2d 92, 93 (3d Cir.1986). This standard of review applies with regard to three issues on appeal. First, it is a question of law whether a single factor test or a multiple factor analysis is employed to determine if a property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business. Second, it is a question of law whether nonrecourse indebtedness in excess of fair market value may support depreciation and interest deductions. Third, it is a question of law whether deductions based on such indebtedness should be completely disallowed when a taxpayer fails to meet his burden of proof of the fair market value of the property.
 
 
 18
 The Tax Court's conclusion that the nonrecourse indebtedness on the underlying transaction exceeded the fair market value of Summit House was a finding of fact subject to review for clear error only. See Anderson v. Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); Commissioner v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198-99, 4 L.Ed.2d 1218 (1960); B.B. Rider Corp. v. Commissioner, 725 F.2d 945, 948 (3d Cir.1984).
 
 
 19
 PSLC argues that while factual findings are generally subject to review under the clearly erroneous standard, the Tax Court finding that the underlying transaction was not of property held primarily for sale to customers within the ordinary course of its trade or business, constituted an "ultimate fact" subject to plenary review. The Commissioner, however, urges that we accept this finding unless it was clearly erroneous. We have indicated that we no longer recognize the ultimate fact exception to the standard that factual findings are reviewed only for clear error. American Home Products Corp. v. Barr Laboratories, Inc., 834 F.2d 368, 370 n. 2 (3d Cir.1987). Further, the Supreme Court has rejected the ultimate fact exception and has stated that the clearly erroneous standard applies to findings of ultimate fact. See Pullman-Standard v. Swint, 456 U.S. 273, 285-90, 102 S.Ct. 1781, 1788-91, 72 L.Ed.2d 66 (1982). Thus, our earlier decisions permitting plenary review of ultimate fact determinations, see, e.g., Jersey Land & Development Corp. v. United States, 539 F.2d 311, 315 (3d Cir.1976); Pennroad Corp. v. Commissioner, 261 F.2d 325, 328 (3d Cir.1958), cert. denied, 359 U.S. 958, 79 S.Ct. 797, 3 L.Ed.2d 766 (1959), cannot be taken to represent the present position of this court. Therefore, to the extent that the Tax Court's conclusion regarding the character of the underlying transaction was predicated on a factual finding, it must be accepted unless clearly erroneous. We add, however, that even under a plenary standard of review we would reach the same conclusion as the Tax Court on this issue. Finally, we point out that PSLC contends that, as a matter of law, the undisputed facts require a reversal of the finding in the Tax Court that the sale of Summit House was not of a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, as we make a plenary determination of legal issues, the dispute over the standard of review is of limited significance in this case.
 
 III. PSLC's APPEAL
 
 20
 Determination of whether PSLC was properly held to be a personal holding company turns solely on whether Summit House was "property held by [PSLC] primarily for sale to customers in the ordinary course of [its] trade or business" within I.R.C. Sec. 1221(1). The Tax Court's opinion provided a clear explanation of the purpose of the personal holding company tax which we need not repeat. We do note that the personal holding company tax is imposed on all corporations satisfying a mechanical test of objective factors which the Tax Court explained in detail.
 
 
 21
 A. The Mechanical Test of the Personal Holding Company Tax
 
 
 22
 Section 541 of the Internal Revenue Code imposes an additional tax on undistributed personal holding company income, as defined in section 545, for "every personal holding company (as defined in section 542)." Section 542(a) provides that any corporation is a personal holding company if it meets mechanical tests relating to the number of stockholders and to the character of income earned during the tax year. Inasmuch as all PSLC stock was owned by one person, PSLC agrees that the stockholder test was met and thus we do not describe that test in detail.
 
 
 23
 The character of income requirement is contained in section 542(a)(1), which provides that "[a]t least 60 percent of [the corporation's] adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year [must be] personal holding company income (as defined in section 543(a))." This may be expressed as follows: a corporation is a personal holding company if the fraction consisting of personal holding company income as the numerator and adjusted ordinary gross income as the denominator is greater than or equal to sixty percent (60%). Our task in establishing this fraction is simplified by the circumstance that during its applicable tax year PSLC had only two kinds of income, income from interest payments on debts arising from the Summit House transactions and income from the sale of the Summit House property.
 
 
 24
 Inasmuch as the parties agree that only the interest payments constituted personal holding company income, the numerator of the fraction is not in dispute. They disagree, however, over calculation of the denominator of the fraction. If the gain from the sale of Summit House is included in the denominator then PSLC is not a personal holding company. But if the gain is excluded then only the interest income is included in both the numerator and the denominator, giving the fraction a value of one or 100% and, since 100% is greater than 60%, PSLC is a personal holding company.
 
 B. Calculation of the Denominator
 
 25
 The denominator of the fraction consists of "adjusted ordinary gross income (as defined in section 543(b)(2))." I.R.C. Sec. 542(a)(1). Section 543(b)(2) defines adjusted ordinary gross income as "ordinary gross income" subject to certain reductions not applicable to this case.
 
 
 26
 "Ordinary gross income" is defined by section 543(b)(1)(A) as gross income less "all gains from the sale or other disposition of capital assets."[6] A "capital asset" is defined by section 1221 to include all property of a taxpayer subject to certain specific exceptions. PSLC argues that the exception for "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" applies to the Summit House. I.R.C. Sec. 1221(1).
 
 
 27
 C. Whether the Sale was Within the Ordinary Course of Trade or Business.
 
 
 28
 While the Commissioner recognizes that a pre-trial stipulation provided that PSLC held Summit House exclusively for sale, he contends that the sale was not of an asset primarily held for sale within the ordinary course of PSLC's trade or business. A determination that PSLC's sale of Summit House was not within the ordinary course of its trade or business would result in the exception of section 1221(1) not applying and, inasmuch as PSLC has not argued that any other exception applies, the general rule of section 1221 would govern. Thus, Summit House would be deemed to be a capital asset and the gain on its sale would be excluded from both PSLC's ordinary gross income and adjusted ordinary gross income. Consequently, PSLC's interest income would constitute the only element of both the numerator and denominator giving the fraction a value of one or 100% and PSLC would qualify as a personal holding company.
 
 
 29
 Thus, it is perfectly obvious that the determination of whether PSLC is a personal holding company turns solely on whether its sale of Summit House was of property held primarily for sale within the ordinary course of its trade or business. PSLC argues that the trial judge's conclusion that its sale of Summit House was not within the ordinary course of its trade or business was clearly erroneous and that, in any event, the Tax Court was required to reach the opposite conclusion as a matter of law.
 
 1. PSLC's Factual Challenge
 
 30
 We have held that determination of whether property is held for sale within the ordinary course of a taxpayer's trade or business is a question of fact. See Jersey Land & Development Corp., 539 F.2d at 315; Juleo, Inc. v. Commissioner, 483 F.2d 47, 50 (3d Cir.) (Gibbons, J., dissenting), cert. denied, 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); Heebner v. Commissioner, 280 F.2d 228, 231-32 (3d Cir.), cert. denied, 364 U.S. 921, 81 S.Ct. 285, 5 L.Ed.2d 260 (1960).[7] PSLC argues that the Tax Court's finding was clearly erroneous because it was inconsistent with the pretrial stipulation that PSLC held Summit House exclusively for sale.
 
 This stipulation reads as follows:
 
 31
 On or about June 1, 1978, PSLC purchased a certain piece of real estate located in West Orange, New Jersey, and certain fixtures, equipment, and other personal property located on or used in connection therewith.... Said purchase was made by PSLC with a view towards immediately reselling the buildings and personalty to its wholly-owned subsidiary, Mount Orange Realty Corp [MORC]. (Emphasis added.)
 
 
 32
 PSLC relies on the emphasized portion. This language, however, is not inconsistent with the Tax Court's conclusion that PSLC did not establish that the Summit House transaction occurred within the ordinary course of PSLC's trade or business for it does not even mention the point.
 
 
 33
 Furthermore, PSLC did not present any evidence as to whether it held Summit House primarily for sale to customers within the ordinary course of its trade or business. Since PSLC bore the burden of proof on this issue, see Tax Ct.R.P. 142(a); Helvering v. Taylor, 293 U.S. 507, 513-15, 55 S.Ct. 287, 290-91, 79 L.Ed. 623 (1935); Anastasato v. Commissioner, 794 F.2d 884, 886-87 (3d Cir.1986), the Tax Court upheld the Commissioner's determination. Judge Cohen pointed out that "[h]ad petitioner chosen to address the issue at trial, it might have submitted evidence demonstrating that the property was held or sold in the ordinary course of PSLC's trade or business. See section 1221(1). Absent such evidence, we cannot find that the property was not a capital asset. Rules 142(a) and 149(b). Respondent's [Commissioner's] determination is sustained." PSLC at 573 (citations omitted).
 
 
 34
 In summary, the stipulation does not state that the Summit House transaction was within PSLC's ordinary course of trade or business and PSLC offered no evidence that it was. Thus, we hold that the Tax Court's factual finding that the sale was not within the ordinary course of PSLC's trade or business was not clearly erroneous.
 
 2. PSLC's Legal Challenge
 
 35
 PSLC nevertheless advances the slightly different argument that, as a matter of law, the stipulated facts required that the Tax Court conclude that sale of Summit House occurred within the ordinary course of its business. In substance, its argument is that as a matter of law it must be concluded that the purchase of an asset for sale subject to a pre-existing contract of sale always results in the acquisition of a property to be held primarily for sale to customers in the ordinary course of trade or business. PSLC argues that the Tax Court erred in failing to follow this single factor approach. If, however, as the Commissioner argues, a court must consider and weigh several factors to make this determination, then PSLC cannot prevail on this theory.
 
 
 36
 This court addressed the problems involved in determining when a sale occurs during a taxpayer's ordinary course of business in Jersey Land & Development Corp., where we stated:
 
 
 37
 Whether or not a taxpayer has held real property for sale to customers in the ordinary course of its business is an issue that has often been litigated in the federal courts. Despite this volume of litigation, however, there is no fixed formula or rule of thumb to which a court may readily resort for guidance in resolving this issue. Rather, each case must, by necessity, turn upon its own facts since this question is, in the final analysis, one of fact to be determined from the totality of the circumstances surrounding each particular case. [539 F.2d at 315 (emphasis added.) ]
 
 
 38
 This fact-specific approach in Jersey Land & Development was consistent with our precedents. See Heebner v. Commissioner, 280 F.2d at 232; Kaltreider v. Commissioner, 255 F.2d 833, 838 (3d Cir.1958). The Tax Court has followed this approach and it is now stated that the determination "[w]hether income from the sale of property is excluded from capital gains treatment is a question of fact, the burden of which is on [the taxpayer]." S & H, Inc. v. Commissioner, 78 T.C. 234, 242 (1982) see Baumgart v. Commissioner, 47 T.C.M. (CCH) 592, 598, 52 T.C.M. (P-H) 3095, 3101 (1983).
 
 
 39
 The characterization of the income from the sale of Summit House is a question of fact depending partially on PSLC's intent with respect to its business activities. See Baumgart, 47 T.C.M. (CCH) at 596, 52 T.C.M. (P-H) at 3099. Several cases have identified a number of factors to be considered in this analysis.[8] The factors most frequently identified are: (1) the purpose for which the taxpayer acquired and held the property; (2) the extent of improvements made to facilitate its sale; (3) the activity of the taxpayer in promoting the sales; (4) the frequency and continuity of sales; (5) the extent and substantiality of sales; (6) the length of time between purchase and sale; and (7) the relative income to the taxpayer from the sale of the property, compared with his other income. See Baumgart, 47 T.C.M. (CCH) at 598, 52 T.C.M. (P-H) at 3101; S & H, 78 T.C. at 243 n. 12. This court has enumerated and relied on these factors. See Kaltreider, 255 F.2d at 838.
 
 
 40
 PSLC has not cited any controlling authority to suggest that we have departed from this multi-factor analysis. PSLC does, however, cite S & H. Morley v. Commissioner, 87 T.C. 1206 (1986), Baumgart, and DeMars v. United States, 71-1 U.S. Tax Cas. (CCH) p 9288, at 86,114, 27 A.F.T.R.2d (P-H) p 71-490, at 71-925 (S.D.Ind.1968), for the proposition that when a taxpayer purchases real estate for sale to a specific party under a pre-existing contract, it holds the property primarily for sale to customers in the ordinary course of business regardless of other factors or facts.
 
 
 41
 S & H and Morley do not stand for the stated proposition. Like our case, those cases involved a taxpayer's single venture and determination of whether the property involved was held primarily for sale to customers within the ordinary course of the taxpayer's trade or business. S & H and Morley merely rejected adoption of an absolute prohibition precluding the court from determining that a unique undertaking was within the scope of the taxpayer's trade or business with respect to that single transaction. As Morley explained, S & H "rejected the so-called 'one-bite' rule to the extent that such rule established that 'a taxpayer who engaged only in one venture or one sale cannot under any circumstances be held to be in a trade or business as to that venture or sale.' " Morley, 87 T.C. at 1211 (citing S & H, 78 T.C. at 244 (emphasis added)). By rejecting a per se rule, the Tax Court in Morley and S & H reaffirmed that this is an issue of fact in which no one fact or factor is dispositive. See Morley, 87 T.C. at 1213.
 
 
 42
 DeMars and Baumgart, however, do go further and state a per se rule, "that property acquired for the purpose of sale to a specific party pursuant to a pre-existing arrangement constitutes property held for sale in the ordinary course of a trade or business." DeMars, 71-1 U.S.Tax Cas. (CCH) p 9288 at 86,117, 27 A.F.T.R.2d (P-H) p 71-490, at 71-929. We, however, decline to follow these cases as we have previously stated that "[n]o single factor or test is dispositive." Kaltreider, 255 F.2d at 838. Thus, we reaffirm our conclusion that whether a property is held primarily for sale to customers within the ordinary course of a taxpayer's trade or business is a fact specific question for which no single factor is dispositive. Here the finding of fact by the Tax Court on the issue was not clearly erroneous and thus must be upheld. In any event, on an independent review of the record we would reach the same result because of the lack of evidence that the transaction involved a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, we will affirm the judgment of the Tax Court on PSLC's appeal.
 
 IV. THE PRUSSINS' APPEAL
 
 43
 The Prussins, as limited partners in PSA, claimed a deduction for their distributive share of PSA's depreciation and interest deductions which the Commissioner, upheld by the Tax Court, completely disallowed. Three issues are raised with respect to the Tax Court's decision on this point. First, we consider whether PSA's purchase of Summit House, and not the individual limited partners' investment in PSA, is the appropriate transaction for examination. Second, we must decide whether the Tax Court's finding of fact that PSA's nonrecourse indebtedness substantially exceeded the fair market value of Summit House was clearly erroneous. Third, we must consider which of the following approaches should be followed: (1) the excess nonrecourse indebtedness may support the claimed deductions; (2) the presence of excess nonrecourse indebtedness requires a complete disallowance of the claimed deductions; or (3) only deductions attributable to the nonrecourse indebtedness to the extent that it was excessive should be disallowed.
 
 
 44
 A. The Relevant Inquiry Takes Place at the Partnership Level
 
 
 45
 The Prussins urge that we consider the transaction from the perspective of the individual limited partners who did make substantial cash contributions for their investments. But a partnership is required to file its own federal income tax return. Accordingly, for the purpose of computing income and deductions, "the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners." United States v. Basye, 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); accord Brannen v. Commissioner, 722 F.2d 695, 703 (11th Cir.1984). After the partnership's income and deductions are calculated and reported it is a conduit through which income and deductions are distributed to individual partners. See Brannen, 722 F.2d at 703; Goodwin v. Commissioner, 75 T.C. 424 (1980), aff'd without published opinion, 691 F.2d 490 (3d Cir.1982). Thus, inasmuch as the Prussins claim losses from the Summit House transaction because of George Prussin's limited partnership interest in PSA, we must make our analysis of the investment from the point of view of the partnership. See Simon v. Commissioner, 830 F.2d 499, 506-07 (3d Cir.1987). This conclusion renders immaterial the Prussins' argument which, predicated on the investment of the limited partners, is that this transaction should be regarded as an at risk rather than a nonrecourse transaction.
 
 
 46
 B. Whether PSA's Nonrecourse Indebtedness Exceeded the Fair Market Value of Summit House
 
 
 47
 If we assume, even though the record is unclear on this point, that PSA paid the $500,000 which MORC was to have paid to PSLC, PSA's purchase price for Summit House was $7,759,200, of which no more than $500,000 was paid other than by creation of nonrecourse indebtedness. Otherwise it was $7,259,200. It is this investment which must be compared to the fair market value of Summit House.
 
 
 48
 The Prussins challenge Judge Cohen's finding of the maximum fair market value. At trial they had the burden of proof on the issue. Tax Ct.R.P. 142(a); see Helvering v. Taylor, 293 U.S. at 513-15, 55 S.Ct. at 290-91; Anastasato v. Commissioner, 794 F.2d at 886-87. But they introduced no significant evidence of valuation and they produced no expert testimony on this point.[9]
 
 
 49
 While normally the parties to a real estate transaction have adverse economic interests and thus can be expected to establish fair market value themselves, Judge Cohen explained that here "[s]ales subsequent to PSLC's acquisition of the property ... were not at arm's length, and provide no evidence of the property's fair market value." PSLC at 575. This determination rested on her perception of the motivation for the conveyances: "in a transaction entered into primarily to generate tax benefits, the interests of the buying and selling parties are not necessarily adverse." PSLC at 575.
 
 
 50
 The Prussins challenge this line of reasoning by asserting that not paying money out is almost always better than getting a deduction. Thus, PSA would not pay an excessive amount for the property. While their reasoning is generally true, the Tax Court cited PSA's own projected tax benefits to demonstrate that this transaction did indeed provide deductions sufficient to compensate for the additional money paid out. See PSLC at 570. In addition, there was no evidence that PSA had attempted to negotiate the sales price. We conclude that Judge Cohen was justified in considering indications other than what PSA paid to determine the fair market value of Summit House.
 
 
 51
 The Tax Court did consider the following indicia of fair market value: (1) PSLC had paid $4,200,000 for the improvements and the land in an arms length transaction immediately before selling the improvements to PSA for over $7,700,000, see PSLC at 573-76; (2) the assessed value of the improvements for property tax purposes suggested a fair market value of $1,522,500;[10] (3) the improvements were insured for $2,745,000;[11] and, (4) the improvements and land were sold in 1985 for $7,000,000.
 
 
 52
 The Prussins argue that the Tax Court erroneously ignored oral testimony regarding the anticipated increase in value of Summit House provided it could be marketed as originally envisioned as cooperatives or condominiums, a purpose frustrated by a change of local law. We, however, see no reason to accept this assertion in view of Judge Cohen's analysis of the evidence in the record. Further, the facts of this case demonstrate the peril in relying on anticipated changes in a property to support an enhanced value. In short, Judge Cohen did not have to reject solid evidence showing a maximum fair market value because of a speculative projected new use.
 
 
 53
 The Prussins erroneously assert that Judge Cohen held that PSLC's purchase price was conclusive of fair market value in PSA's subsequent purchase. She, however, did not hold that Summit House could be worth no more to PSA than PSLC had paid for the property. What she did hold was that the Prussins had failed to meet their burden of proof on value and that only the sale to PSLC on the record provided evidence of the value of Summit House. Furthermore, she did not find that fair market value was $4,200,000; she concluded that fair market value could not have been more than that sum. See PSLC at 575.
 
 
 54
 Given her consideration of many different bases for finding fair market value and the Prussins' failure to present expert testimony on value, we conclude that Judge Cohen's findings as to the maximum fair market value were not clearly erroneous. Accordingly, we will not disturb her finding that the nonrecourse financing exceeded the fair market value of Summit House.
 
 C. The Appropriate Legal Standard
 
 55
 The Internal Revenue Code does not expressly provide in any section germane to this case for any adjustment of deductions when nonrecourse debt exceeds fair market value.[12] Thus, it is necessary to analyze the overall statutory framework and legal precedents to understand the significance of the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House.
 
 1. The Statutory Framework
 
 56
 The Internal Revenue Code allows a deduction for "a reasonable allowance for the exhaustion, wear and tear" of property used in the taxpayer's trade or business and of property held for the production of income. I.R.C. Sec. 167(a). This depreciation deduction is calculated using the adjusted basis of the property used to calculate gain under section 1011. See I.R.C. Sec. 167(g). The basis of the property for purposes of calculating gain under section 1011 is ultimately defined in section 1012. Section 1012 provides that generally the "basis of property shall be the cost of such property."The cost of property includes the amount of indebtedness incurred or assumed by the purchaser as part of the purchase transaction. See Crane v. Commissioner, 331 U.S. 1, 9-10, 67 S.Ct. 1047, 1052-53, 91 L.Ed. 1301 (1947). However, several courts of appeals have held that nonrecourse debt in excess of fair market value is not included in the cost of property for purposes of calculating the depreciation deduction. See, e.g., Odend'hal v. Commissioner, 748 F.2d 908, 912-14 (4th Cir.1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir.1976).
 
 
 57
 Section 163(a) of the Internal Revenue Code allows a deduction for all interest paid or accrued within the taxable year on indebtedness. This provision allows a deduction for interest paid on nonrecourse debt. It has been held, however, that when "both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no 'genuine indebtedness' exists and no 'investment in the property' occurs." Flowers v. Commissioner, 80 T.C. 914, 942 (1983); see also Odend'hal, 748 F.2d at 912-14; Estate of Franklin, 544 F.2d at 1049.
 
 
 58
 Although separate statutory provisions govern interest and depreciation deductions, the case law typically merges issues relating to their allowance. Thus, when nonrecourse debt is excluded from the basis for purposes of calculation of depreciation, it is not treated as genuine indebtedness for determination of interest deductions.
 
 
 59
 2. Whether the Nonrecourse Indebtedness is Included In PSA's Basis and Whether it is "Genuine Indebtedness"
 
 
 60
 Although this court has not previously addressed this issue,[13] decisions of other courts of appeals have disallowed deductions for interest and depreciation in circumstances similar to those here. Some of these cases specifically involve investments in real estate and improvements.[14]
 
 
 61
 Of the cases decided by other courts of appeals, that most similar to this case is Odend'hal v. Commissioner, 748 F.2d 908. Odend'hal stands for the proposition that if the fair market value of property is less than its nonrecourse financing, the principal of the nonrecourse financing in excess of fair market value is not included in the basis for the purpose of claiming depreciation. Moreover, Odend'hal holds this excess nonrecourse debt does not sustain a deduction for interest payments.
 
 
 62
 The facts of Odend'hal were as follows. Ten taxpayers purchased a warehouse and food processing facility. As in this case, the taxpayers acquired only the improvements and a long term lease on the land.[15] The purchase took place in December of 1972 for a total consideration of $4,000,000 of which $80,000 was paid in cash and $3,920,000 was financed by nonrecourse debt. Interest on the nonrecourse debt was to be serviced currently but the principal was due in a balloon payment at the end of a fifteen year period.
 
 
 63
 The promoter of this investment represented that based on a depreciable lifespan of fourteen-and-a-half years, the income earned from leasing the property would not equal the total of the cost of leasing the land, mortgage interest, and depreciation. However, he explained that the interest and depreciation deductions would generate additional tax benefits so that an investor in the 50% tax bracket would convert the investment income loss into an after-tax gain.
 
 
 64
 Although the taxpayers purchased the property for $4,000,000, the Tax Court concluded that its fair market value was only $2,000,000. Because of the wide discrepancy between the face value of the nonrecourse debt and the fair market value, the Tax Court held that the nonrecourse note did not represent genuine indebtedness. Thus, it did not allow the taxpayers to include the nonrecourse debt in their basis for purposes of depreciation. In addition, the taxpayers were allowed to deduct interest and other expenses only to the extent of their income from the property.
 
 
 65
 The taxpayers appealed to the United States Court of Appeals for the Fourth Circuit, arguing that the Tax Court's determination of fair market value was clearly erroneous and that, as a matter of law, the Tax Court was bound to recognize the entire nonrecourse indebtedness when computing depreciation and interest deductions. The Court of Appeals rejected both contentions.
 
 
 66
 In finding that the Tax Court's valuation of the property was not clearly erroneous, the Court of Appeals relied, in part, on the fact that the same property had been conveyed for $2,670,000 in an arm's length sale five years before it was sold to the group of ten taxpayers. See id. at 911-12. Once the fair market value was established the court turned to the issue of the excessive nonrecourse debt. It stated:
 
 
 67
 If, as a matter of fact, the fair market value of the property is less than that financed by a nonrecourse loan, the authorities hold that the principal of the nonrecourse loan which exceeds fair market value does not represent a real investment in the property by a taxpayer and he may not include that nonrecourse amount in his basis for depreciation. In addition, the interest paid on the loan is not allowable as an interest deduction. Basis for depreciation usually includes the amount of any indebtedness incurred or assumed by the purchaser in connection with the purchase of the property, because the taxpayer has an obligation to pay the debt. When the debt is a nonrecourse loan, the principal amount of the loan is included in the taxpayer's basis so long as the fair market value of the property is at least equal to the amount of the nonrecourse debt at the time it was incurred, because the taxpayer, even though he has no personal liability at stake, has an economic incentive to pay off the debt rather than to lose the collateral. But if the stated price financed by nonrecourse debt exceeds the fair market value of the property, to the extent of the excess, the taxpayer has no equity in the property to protect and no economic incentive to pay off the debt. [Id. at 912.] (Citations omitted.)
 
 
 68
 Under this analysis taxpayers are able to claim depreciation and interest deductions to the extent that nonrecourse debt does not exceed fair market value.
 
 
 69
 Odend'hal ultimately relied on Estate of Franklin, 544 F.2d 1045, which imposed similar limits on deductions supported by nonrecourse debt. In Estate of Franklin the owner of a motel agreed to sell it for $1,224,000 with the entire purchase price to be paid by a note secured by a nonrecourse mortgage with monthly principal and interest installments of $9,045.36. A balloon payment of $975,000 was due ten years from the sale. The property was leased back to the seller for a monthly rental equal to the $9,045.36 monthly debt service. The seller was responsible for operating the motel and paying all expenses. The buyers' only cash payment was $75,000 of prepaid interest.
 
 
 70
 The buyers claimed that they could take interest and depreciation deductions for the ten years and then either make the balloon payment and complete the purchase or back out of the purchase. The Tax Court characterized this transaction as a ten year option to purchase and accordingly disallowed the deductions for interest and depreciation.
 
 
 71
 The Court of Appeals for the Ninth Circuit considered the case from a different perspective. It held that if the transaction met two criteria it would not be considered a sale for tax purposes and thus no interest or depreciation deductions would be allowed. The first test was whether the value on which the transaction was based exceeded the fair market value of the property. The second factor was whether the transaction was financed with nonrecourse debt which exceeded the fair market value of the underlying property. The Court of Appeals concluded that the transaction in Estate of Franklin met these two criteria and thus it affirmed the Tax Court.
 
 
 72
 The Prussins attempt to distinguish Odend'hal and Estate of Franklin on two rationales. First, they argue cash represented only three percent of the purchase price in Odend'hal and just over six percent of the purchase price in Estate of Franklin, as opposed to their own more substantial investment in PSA. Second, they contend the large balloon payments in Odend'hal and Estate of Franklin demonstrate that the transactions were mere options to purchase and that here there are no such balloon payments.
 
 
 73
 Each of these attempts to distinguish Odend'hal and Estate of Franklin must fail. With regard to the first objection, the appropriate comparisonwith Odend'hal and Estate of Franklin is the proportion of cash to nonrecourse debt paid by PSA rather than the amount of the individual limited partners' cash investments. Based on a purchase price of $7,759,200 and a $500,000 cash payment, assuming it was made, this calculation would indicate that 6.44% of the purchase price was paid in cash. This analysis reveals the similarity of this case to the precedents rather than providing a basis to distinguish them. Of course, the Prussins' argument is even weaker if the $500,000 was not paid.
 
 
 74
 The Prussins' second rationale partially misstates the terms of PSA's obligations. As we have indicated, principal payments on the mortgages were substantially postponed.[16] But even if they were not, it is the existence of deferred nonrecourse indebtedness in excess of the value of the property that creates the economic disincentive to pay the debt. While there may be less incentive to make a balloon payment at the end of a term as compared with earlier structured payments, the proper analysis must be predicated on a comparison of the nonrecourse debt to the fair market value of the property at its acquisition.
 
 
 75
 The Prussins attempt to distinguish other cases applying Estate of Franklin to real estate investments. Both Beck v. Commissioner, 678 F.2d 818 (9th Cir.1982), and Narver v. Commissioner, 75 T.C. 53 (1980), aff'd per curiam, 670 F.2d 855 (9th Cir.1982), are supposedly inapplicable in light of the small percentage of the purchase price paid in a form other than nonrecourse debt and the great overvaluing of the property. But the Prussins' attempt to distinguish these cases must fail for the same reason that Odend'hal and Estate of Franklin cannot be distinguished: that is, the Prussins are not comparing the same parts of the different transactions as they are looking to the limited partners' investment rather than that of PSA. The Summit House purchase price was substantially paid by PSA with nonrecourse obligations.[17]
 
 
 76
 While we regard Odend'hal and Estate of Franklin as the appropriate precedents, we do not consider them as authority to eliminate all deductions for interest and depreciation. While we realize that a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, including the amount not exceeding the fair market value of the property, it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the value of the property. For example, if a creditor held a nonrecourse debt for $1,500,000 on a property with a fair market value of $1,000,000, he would have a disincentive to foreclose if his defaulting debtor offered to settle the debt for not less than $1,000,000. Thus, it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation and interest deductions and to regard the nonrecourse debt as genuine indebtedness to the extent it is not disregarded. Moreover, there is precedent for disallowing deductions based on nonrecourse debt only insofar as attributable to the excess of debt over the fair market value. See Odend'hal, 748 F.2d at 912-14.
 
 
 77
 Unquestionably, the record compels the conclusion that Summit House, though not exceeding $4,200,000 in fair market value, had a substantial value. Thus, under our analysis the Tax Court's determination that the deductions should be disallowed in full cannot be sustained. Accordingly, we will remand the case to the Tax Court for a determination of fair market value of Summit House at the time of PSA's acquisition.[18]
 
 
 78
 We also conclude that the actual cash investment of PSA in the purchase of Summit House, if there was any, should be disregarded in the calculation of the fair market value as it obviously was at risk. While Judge Cohen inferred that the $500,000 was not paid by PSA, we are not satisfied that this was necessarily correct, particularly in view of the Commissioner's brief in which it is recited that it appears that the $500,000 was paid from the investor's funds. According to the Prussins, the absence of evidence establishing that the $500,000 was paid is attributable to the fact that there was no issue at trial raised regarding this point. On the remand it may be definitively ascertained whether the payment was made. The significance of the cash investment is that there is an economic reason to pay off a nonrecourse debt when there is some equity in the property, even though the total debt when added to the equity exceeds the value of the property, as the alternative to paying the debt is the loss of the equity. Thus, if there is a $500,000 equity in a property worth $4,000,000, the owner of the property should logically be willing to pay off up to $4,000,000 in nonrecourse debt to save the property because his loss in that case will not exceed $500,000 but his loss in giving up the property will be $500,000.
 
 
 79
 The Prussins' constitutional challenge is based on a contention that they were denied due process of law by the total disallowance of the deductions. Thus, they do not assert that the result we reach would deny them due process of law. Accordingly, their constitutional argument is moot and will not be considered.
 
 V. CONCLUSION
 
 80
 In summary, we hold that PSLC failed to establish that it held Summit House primarily for sale to customers in the ordinary course of its trade or business. Hence, the decision of the Tax Court with respect to PSLC will be affirmed. We hold that the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House was not clearly erroneous and will not be disturbed. We also hold that PSA's nonrecourse debt did not support interest and depreciation deductions to the extent it exceeded the sum of the cash investment of PSA in Summit House and the fair market value of Summit House at the time of its purchase. We will partially reverse the decision as to the Prussins and will remand the matter to the Tax Court for a determination of the fair market value of Summit House, the actual cash investment, if any, made by PSA for the purchase of Summit House, and forfurther proceedings consistent with this opinion which will partially allow the interest and depreciation deductions claimed by them.
 
 OPINION
 GREENBERG, Circuit Judge
 
 81
 The Commissioner filed a petition urging this panel of the court to reconsider our opinion filed on November 25, 1988. Although we will deny the petition we will address several of the Commissioner's arguments.
 
 
 82
 As framed by the Commissioner the issue meriting rehearing is:
 
 
 83
 Whether a taxpayer who has acquired property subject to nonrecourse indebtedness that is far larger than the fair market value of the property at the time of acquisition is entitled to deductions for interest and depreciation attributable to the nonrecouse indebtedness to the extent of the fair market value of the collateral.
 
 
 84
 Our opinion answered this question in the affirmative.
 
 
 85
 The Commissioner petitions for reconsideration on two bases. First, he objects to our reading of several precedents upon which we rely as persuasive authority. Second, the Commissioner argues that our opinion will create valuation problems which will produce intolerable administrative burdens.
 
 
 86
 The Commissioner's first argument refers to our reliance on Odend'hal v. Commissioner, 748 F.2d 908 (4th Cir. 1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706(1985) and Estate of Franklin v. Commissioner., 544 F.2d 1045 (9th Cir. 1976). He argues that the courts in these cases disallowed any depreciation or interest deductions rather than disallowing only deductions attributable to the excess nonrecouse debt. Accordingly, he contends that we should disregard the language in each of the opinions suggesting the contrary result.
 
 
 87
 We observe, however, that in both Odend'hal and Estate of Franklin, as the Commissioner seems to acknowledge, the issue of whether the taxpayers were entitled to a partial deduction was apparently not raised either before the Tax Court, see Odend'hal v. Commissioner, 80 T.C. 588, 590, 602-05, 617-18(1983); Estate of Franklin v. Commissioner, 64 T.C. 752, 760-62, 770-71 (1975), or on appeal, see Odend'hal, 748 F.2d at 909, 912, 913: Estate of Franklin, 544 F.2d at 1046, 1048-49. In this case the issue was squarely presented to the court, and thus we were required to rule on it. We found the opinions and reasoning in Odend'hal and Estate of Franklin persuasive while we found their holdings, which did not directly address this issue, not in opposition. Indeed, the Commissioner acknowledges in his petition for rehearing that "[t]o be sure, there is language in the opinions in both Odend'hal and Estate of Franklin, which, taken out of context, could be read as consistent with the panel opinion here."
 
 
 88
 The Commissioner's second argument is based on a misreading of our opinion. The Commissioner correctly notes that we call "for the taxpayers to use the fair market value of the property on the date of purchase in determining how much of the nonrecourse debt to allow in calculating their basis in the property." However, the Commissioner suggests that we would allow annual recalculations of the portion constituting genuine indebtedness " because [the taxpayers] have an incentive to repay a greater amount of the nonrecouse debt each year." Accordingly, the Commissioner observes that these recalculations would impose administrative burdens and produce "computational anarchy". We cannot perceive how the Commissioner arrived at this understanding as we said that "it is appropriate to disregard only the portion of nonrecouse debt in excess of the fair market value of the property when it was acquired for purposes of the depreciation and interest deductions and to regard the nonrecouse debt as genuine indebtedness to the extent it is not disregarded." Panel opinion, supra, at 277-78 (emphasis added.) We never suggested that there would be annual reevaluations. Thus, the administrative burdens which the Commissioner contemplates do not exist. However, to clear up any possible misunderstanding, we now expressly state that our opinion of November 25, 1988, is not to be read to require periodic recalculations of the sum of nonrecourse debt constituting genuine indebtedness.
 
 
 89
 The Commissioner argues in support of his second basis for rehearing that "a borrower whose note exceeds a reasonable estimate of the fair market value of the property has no immediate incentive to pay off any part of the note, because his payments will not give him any equity in the property unless and until the value of his interest exceeds the face amount of the note." In this regard the Commissioner points out that "the investor's entitlement to the claimed tax benefits" is fixed at the time the property is acquired. But if the lender is rational the borrower does have an incentive to pay off a portion of the debt for the lender has a disincentive to foreclose if the purchaser offers to pay the debt up to the value of the property. While the Commissioner dismissed the compromise possibility as "entirely speculative" and "wholly unpredictable at the time the borrower acquires the property subject to the non-recourse note" his argument proves too much because the concept of disallowance of the deductions in excess non-recourse financing situations is based on the theoretical economic disincentive to the borrower to pay the debt rather than upon what ultimately happens. It is no more speculative to assume that the lender will act rationally in compromising than it is to assume that the borrower will not foolishly pay the entire nonrecourse debt. We said as much in our original opinion and we see no reason to change our conclusion in this regard.
 
 
 90
 The Commissioner's Petition for Rehearing will be denied.
 
 
 
 [1]
 years with respect to which tax liability is contested predate the enactment of the Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085. Thus, while that Act redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, see id. Sec. 2, we refer throughout this opinion to the 1954 Code which governs the substantive issues
 
 
 [2]
 A related case, Estate of Isaacson v. Commissioner, 2d Cir., Docket No. 88-4062, arising from the same transaction but involving different taxpayers, was appealed to the United States Court of Appeals for the Second Circuit. In this related case, the estate of Melvin W. Isaacson and Miriam A. Isaacson appealed from a decision disallowing deductions for depreciation and interest based on Melvin Isaacson's ownership of two limited partnership units in PSA. Venue for the Isaacson appeal lay to the Court of Appeals for the Second Circuit rather than to this court because the Isaacsons resided in Connecticut at the time their tax court petitions were filed. I.R.C. Sec. 7482(b). PSLC and the Prussins in their brief recite that the Commissioner "would not consent to a consolidation of these appeals." On October 24, 1988 the court affirmed the Isaacson appeal in a per curiam opinion for the following reason: "We agree with the reasoning and conclusions of the Tax Court, and, for the reasons set forth in Judge Cohen's thorough opinion, the judgment of the Tax Court is affirmed." 860 F.2d 55. Notwithstanding the opinion of the Court of Appeals for the Second Circuit, we have independently arrived at our result which is partially different. We note that in its brief recitation of the facts, the Court of Appeals for the Second Circuit indicated that $500,000 was paid in cash by PSLC for the original purchase. We are confident that the correct figure was $250,000, as set forth by Judge Cohen
 
 
 [3]
 The $500,000 was not paid by MORC. A pretrial stipulation indicated that it was to be paid but does not indicate that this happened. In their brief, appellants suggest it was borrowed and was thus owed. It should be noted that the consideration in the PSLC and MORC purchases was divided between personal property and real estate but the allocation is not significant for our purposes
 
 
 [4]
 In the Tax Court opinion the judge refers to the gain on the sale of Summit House by PSLC as being on a sale to MORC but the parties refer to it as being on the sale to PSA and therefore, in effect, being of MORC. Thus, PSLC in its brief, in an assertion that the Commissioner does not challenge, indicates that "the Commissioner determined that PSLC realized a capital gain of $3,742,704 from its sale of Summit House to PSA of which $464,069 was recognizable in PSLC's taxable year ending May 31, 1979, because of the application of the installment method. Although PSLC's sale was of the stock of MORC, the Commissioner computed the gain as if PSLC had sold Summit House to PSA" for $7,759,200. Elsewhere, however, PSLC refers to the $464,069 as "income realized on the sale of real property to its subsidiary by PSLC...." We will not linger on this point as all of the transactions we have described were clearly part of a related program. Furthermore, the parties do not treat the question of which transfer was taxed as significant. We do note that the size of the gain suggests that the transfer to PSA was taxed. We also point out that it was not simply the Commissioner who determined that there was a gain of $3,742,704, as suggested in the quotation, for PSLC reported that gain on its tax return
 
 
 [5]
 In its brief, the Commissioner indicates that the deficiencies were $229,842.80 and $138,112.50. These figures come from the decision of the Tax Court rather than the opinion. On the record before us, we cannot account for this discrepancy but are not required to do so as the deficiencies will in any event be recalculated
 
 
 [6]
 There are other exclusions as well but they are not applicable
 
 
 [7]
 The determination of the taxpayer's primary purpose in holding the property is made as of the time of sale. Jersey Land & Development, 539 F.2d at 315. Here, the circumstances were such that PSLC's purpose in holding the Summit House could not have changed in the time between when it acquired the property and sold the shares of MORC
 
 
 [8]
 This court has observed, however, that while these factors may be helpful in analyzing residential real estate transactions, they are of limited utility when commercial real estate is involved. See Jersey Land & Development, 539 F.2d at 316
 
 
 [9]
 Judge Cohen observed that Tax Court Rule of Procedure 143(f) and a pretrial standing order required the taxpayers to present an expert report but that the taxpayers decided to forego expert testimony on the value of Summit House. See PSLC at 574 & n. 6
 
 
 [10]
 The Tax Court relied on the assessed value and the municipality's stated relationship between the assessed value and fair market value. The assessed value had been presented by PSA to its investors in its initial offering memorandum. See PSLC at 575. Judge Cohen considered and rejected the Prussins' contention that PSLC's purchase price was for less than the fair market value. This finding was not clearly erroneous
 
 
 [11]
 The replacement value of the buildings, not the land, was insured for this value under a policy containing a 90 percent coinsurance clause. See PSLC at 574
 
 
 [12]
 The at risk provisions of the Internal Revenue Code of 1954 do not govern this case. See I.R.C. Sec. 465 as amended by the Revenue Act of 1978, Pub.L. No. 95-600, Sec. 201, 92 Stat. 2763, 2814-15 (1978)
 
 
 [13]
 In CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), we held that we would not require the Commissioner to permit contingent or speculative obligations to be included in the basis while the uncertainty surrounding them was unresolved. CRC, like Brountas v. Commissioner, 692 F.2d 152 (1st Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), and Gibson Products Co. v. United States, 637 F.2d 1041 (5th Cir.1981), on which it relied, should thus be regarded as timing cases and, while wholly consistent with our result, are not sufficient authority on which to base our decision
 
 
 [14]
 The Prussins argue that cases involving wasting assets are inapplicable to real estate investments. The Prussins rely on Siegel v. Commissioner, 78 T.C. 659, 690 (1982), to demonstrate that the Tax Court recognizes the distinction between wasting assets and realty when determining whether excess debt should be added to basis. Siegel involved a limited partnership investment in a motion picture and thus to the extent it addresses the treatment of real estate, the portion of Siegel relied on by the Prussins is dictum. The actual holding of Siegel is not inconsistent with our result but even if it was we would not be bound by it
 
 
 [15]
 The lease at the lessees' option was for 99 years. Here it was for 90 years
 
 
 [16]
 We have so concluded on the basis of our study of notes and mortgages in the record. We point out, however, that the Commissioner makes no mention of this point in his brief
 
 
 [17]
 The Prussins challenge the entire Estate of Franklin line of cases by pointing out that inasmuch as this is a limited partnership case, the Commissioner's reliance on the nonrecourse aspect of the transaction is "completely misplaced" as the limited partners were not liable anyway. We do not agree, because the legal insulation of the limited partners in no way would impact on the incentive of the general partner to pay a recourse obligation. Thus, their argument on this point incorrectly looks at the transaction from the wrong perspective. As we have indicated, the relevant inquiry takes place at the partnership level. Their argument may actually cut the other way as in a limited partnership recourse note situation it could be contended that the Estate of Franklin rationale should be followed if the debt is excessive as compared to the value of the property and the general partner is not financially responsible
 
 
 [18]
 While Judge Cohen indicated that "the fair market value of the property could not have been more than $4,200,000," PSLC at 575, she may have concluded that it was $4,200,000, though her opinion does not include a definitive finding on the point. We, however, doubt that she did intend to determine the fair market value as distinguished from the maximum fair market value, as the $4,200,000 figure came from the price to PSLC which included the land and improvements and PSA by purchasing MORC acquired only the improvements. If, however, we misunderstand her findings on this point, the fair market value need not be reconsidered. We also point out that while we are remanding the case for calculation of the fair market value, the Prussins will be limited to a maximum value of $4,200,000, as we are upholding the finding that the fair market value did not exceed that figure